RONALD S. KRAVITZ (SBN 129704)
KOLIN C. TANG (SBN 279834)
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile:  (866) 300-7367
Email: rkravitz@sfmslaw.com
          ktang@sfmslaw.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW WEHNER, Individually and as a representative of a class of similarly situated persons, on behalf of the U.S. ROCHE 401(K) SAVINGS PLAN, <br><br> Plaintiff, <br> v. <br><br> GENENTECH, INC., the U.S. ROCHE DC FIDUCIARY COMMITTEE, DAVID MCDEDE, JUDY EMBRY, KEVIN MARKS, EDWARD HARRINGTON, FREDERICK KENTZ, STEVE KROGNES, JORGE GLASCOCK, and IVOR SOLOMON, <br><br> Defendants. | CASE NO. 20-cv-06894-WHO <br><br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## I.    INTRODUCTION

1.     Plaintiff, Matthew Wehner ("Plaintiff"), individually in his capacity as a

participating employee of the U.S. Roche 401(k) Savings Plan ("Plan"), brings this action under

29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participating employees,

against Defendants, Genentech, Inc. ("Genentech"), the U.S. Roche DC Fiduciary Committee

("Administrative Committee"), David McDede ("McDede"), Judy Embry ("Embry"), Kevin

Marks ("Marks"), Edward Harrington ("Harrington"), Frederick Kentz ("Kentz"), Steve Krognes

("Krognes"), Jorge Glascock ("Glascock"), and Ivor Solomon ("Solomon") (collectively,

"Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and related breaches of applicable law beginning six years from the date this action was commenced and continuing to the date of judgment (the "Class Period").

2.     Defendants have engaged in significant and severe breaches of fiduciary duty that have caused the Plan to suffer millions of dollars of losses in the past six years.  As explained in detail below, it is apparent that Defendants approached their fiduciary duties in an irresponsible manner that, at best, reflects a complete lack of understanding of the nature of the fiduciary duties at issue and the diligence required of them by law.  In addition, it appears that, as a result of the anachronistic Master Trust structure maintained by Defendants to hold the Plan's assets (along with the assets of other qualified retirement plans for which Defendants also serve as fiduciaries), Defendants have maintained an opaque fee structure that conceals important material information from Plan participants and that Defendants breached their duty of loyalty to the Plan.

3.     The Plan is a defined contribution plan.  Defined contribution plans are qualified as tax-deferred vehicles and have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

4.     As of December 31, 2019, the Plan had 34,178 participants with account balances. As a result, the Plan had more participants than 99.96% of all of the defined contribution plans in the United States in 2019.  The Plan also had just under $9.4 billion in plan assets as of

December 31, 2019, which is more plan assets than 99.99% of all defined contribution plans in the United States in 2019.

5.     Defendants maintain the Plan and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, are obligated to (a) act for the exclusive benefit of participants, (b) ensure that the investment options offered through the Plan are prudent and diverse, and (c) ensure that Plan expenses are fair and reasonable.

6.     Defendants have breached their fiduciary duties to the Plan and, as detailed below, have: (1) allowed unreasonable recordkeeping/administrative expenses to be charged to the Plan; and (2) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).  Defendants' severe breaches of duty have caused the Plan to suffer millions of dollars in losses, as also explained in detail below.

7.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiff brings this action under ERISA Sections 404, 409, and 502, 29 U.S.C. §§ 1104, 1109, and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiff seeks such other equitable or remedial relief for the Plan and the proposed class defined below (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8.     Plaintiff specifically seeks the following relief:

    a.     A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.  THE PARTIES

9.      Plaintiff is a former employee of Genentech and is a current participant in the Plan under 29 U.S.C. § 1002(7).  Plaintiff is a resident of Bothell, WA.

10.      Genentech is a Delaware domestic corporation headquartered in South San Francisco, CA.  Genentech was acquired by Roche Holdings, a pharmaceutical company based in Basel, Switzerland, in 2009 and now operates as a member of the Roche Group, one of the largest pharmaceutical companies in the world.

11.      The Administrative Committee is the Plan administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at Genentech's corporate headquarters in South San Francisco, CA.  The Administrative Committee and its members are appointed by Genentech to administer the Plan on Genentech's behalf.

12.      Defendants, McDede, Embry, Marks, Harrington, Kentz, Krognes, Glascock, and Solomon, are or were members of the Administrative Committee during the Class Period and, by virtue of their membership, fiduciaries of the Plan.

### III.   JURISDICTION AND VENUE

13.     Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

15.      Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Genentech's principal place of business is in this District and the Plan is administered from this District.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

16.     Plaintiff has standing to bring this action.  ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiff and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

### IV.   ERISA'S FIDUCIARY STANDARDS

17.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a)(emphasis added), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -

(A)      for the exclusive purpose of

    (i)      providing benefits to participants and their beneficiaries; and

    (ii)      defraying reasonable expenses of administering the plan;

[and]

(B)      with the care, skill, prudence, and diligence **under the circumstances then prevailing** that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

18.      By explicitly providing that fiduciaries must discharge their duties with "the care, skill, prudence, and diligence *under the circumstances then prevailing . . .*," ERISA explicitly acknowledges that the standard of care for fiduciaries can, and does, in fact, change over time. As a result, conduct that may not have constituted a breach of fiduciary duty in, for example, 2008, may constitute a breach under the circumstances prevailing in 2014 and, likewise, conduct that did not amount to a breach in 2014 may well constitute a breach in 2020.

19.      ERISA also requires both procedural prudence and substantive prudence from fiduciaries.  That is because "[a] pure heart and an empty head are not an acceptable substitute for proper analysis." *Donovan v. Cunningham*, 716 F.2d 1445 (5th Cir. 1987).

20.      Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

21.      Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

22.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

23.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271-72 (2d Cir. 1982).

24.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

25.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall

be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

26.     As set forth above and herein, Defendants are Plan fiduciaries.  Fiduciary duties under ERISA are non-delegable in nature.

27.     ERISA fiduciary duties are the highest known to the law and must be performed with an eye exclusively to the interests of participants.  ERISA fiduciaries exercising authority or control over plan assets, including the selection of plan service providers and investments, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of others, including RPS providers to the Plan or firms who provide investment products and services.  Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable.  *In re Frost National Bank*, DOL Op. 97–15A, 1997 WL 277980 (May 22, 1997); *In re Aetna Insurance Company, Inc.*, DOL Op. 97–16A, 1997 WL 277979 (May 22, 1997); *see also* 29 U.S.C. §1103(c)(1).

28.     Defendants' fiduciary duties apply continuously in the administration of the Plan and do not abate upon the engagement of service providers.  Fiduciaries must ensure that the amount of fees paid to service providers is reasonable, and they have an ongoing duty to monitor fees being paid to plan service providers for reasonableness, as well as the performance of these service providers.

29.     29 U.S.C. §1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. §1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

30.     Section 1132(a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## V.     FACTUAL ALLEGATIONS

### A.     The Defined Contribution Industry

31.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan.  A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals. Employees with money in a plan are referred to as "participants."

32.     As of September 2020, Americans had approximately $9.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020), *available at* https://www.ici.org/research/stats/retirement/ret_20_q3.  Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx.  By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

33.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness have stark financial consequences for retirees.  Every extra level of expenses imposed upon plan

participants compounds over time and reduces the value of participants' investments available upon retirement.

34.     The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans.  In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.  But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. at 1823, 1826 (2015).  Thus, the employer has less incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

35.     As retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees can dramatically reduce the amount of benefits available when participants are ready to retire.  Over time, even small differences in fees compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 135 S. Ct. at 1825.

36.     The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic.  The DOL has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[1]

37.     Plan participants typically have little appreciation of the fees being assessed to their accounts.  Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in 401(k) plans, and 37% were unaware that they paid 401(k) fees at all.[2]  It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and make sure fees remain reasonable for the services provided and properly and fully disclosed. Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often have little understanding of the fees being charged to the retirement plans of which they are stewards and the investment options being offered to retirement plan participants.

38.     In 401(k) plans, the plan allocates the trust assets among plan participants through a Retirement Plan Services ("RPS") provider (often referred to generically as a "recordkeeper") that tracks each participant's account, which consists of his/her share of plan investments and returns.

**B.     Retirement Plan Services**

39.     Fiduciaries of virtually all "large" defined contribution plans, including the Plan here, hire one RPS provider to provide the essential Recordkeeping & Administrative ("RK&A") services for the retirement plan.

---

[1] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited March 1, 2021).

[2] *See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (last visited March 1, 2021).

40.     There are two types of essential RK&A services provided by all national RPS providers.  For large plans with substantial bargaining power (like the Plan), the first type is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis):

    a.   Recordkeeping

    b.   Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor)

    c.   Administrative Services related to converting a plan from one RPS provider to another RPS provider

    d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials)

    e.   Maintenance of an employer stock fund (if needed)

    f.   Distribution services

    g.   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements

    h.   Plan consulting services including assistance in selecting the investments offered to participants

    i.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor)

    j.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm)

    k.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

41.     The second type of essential RK&A services provided by all national RPS providers often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants (usage fee).  The rationale is, for example, that one participant should not pay fees to cover the loan fees for other participants who choose to take a loan.  These services typically include the following:

     a.   Loan Processing

     b.   Brokerage services / account maintenance (if offered by the plan)

     c.   Distribution services

     d.   Processing of Qualified Domestic Relations Orders

42.     All national providers of RPS have the capability to provide all of these services and provide all of them to all large plans, including defined contribution retirement plans that are much smaller than the Plan.

43.     For large plans with greater than 5,000 participants, any minor variations in the way that these essential RK&A services are delivered have no material impact on the fees charged by RPS providers to deliver the services.  That fact is confirmed by the practice of all service providers quoting fees on a per participant basis without regard for any individual differences in services requested -- which are treated by the services providers as largely immaterial because they are, in fact, inconsequential from a cost perspective to providers of RK&A services.

44.     Unlike the other "pay-as-you-eat" services, the inclusion of a brokerage option in a plan creates an additional channel to deepen a RPS provider's customer relationship with participants, which has a significant value to most RPS providers – in this case, Fidelity Workplace Services LLC ("Fidelity").  A brokerage option also creates an incremental and additional revenue and profit stream for the recordkeeper (here, Fidelity) to earn from the overall relationship with the Plan, while also modestly reducing certain expenses that a RPS service provider otherwise incurs to provide RK&A services – because the brokerage offering results in participants reducing their interactions with the non-brokerage service division of the RPS service provider.  This additional stream of revenue and profit should be considered by retirement plan fiduciaries when negotiating the fees with RPS providers.  In other words, a

defined contribution plan with a brokerage window (like the Plan) should be able to obtain lower (not higher) fees for the bundled RK&A services.

45.     The existence of brokerage services does not have a negative impact on the RPS fees earned by RPS providers when providing services to prudent plan fiduciaries.  Rather, as discussed above, the brokerage services provided by Fidelity to the Plan are a separate profit center for the RPS provider.

46.     Since the early to mid-2000s, the RPS provided to large defined contribution plans, like the Plan, have increasingly been treated by prudent plan fiduciaries as a commodity service.  While RPS providers in the defined contribution industry attempt to distinguish themselves through marketing and other means, RPS providers actually offer the same bundles and combinations of services as their competitors.  Indeed, responsible and knowledgeable third-party consultants recognize this fact and insist that RPS fees be capped at a reasonable amount per participant.  As a result, the market for defined contribution retirement plan services has become increasingly price competitive, particularly for large plans that, like the Plan, have a sizable number of participants and a large amount of assets.

47.     Over the past twenty years, the fees that RPS providers have been willing to accept for providing retirement plan services has significantly decreased.  The DOL's proposed Fee Disclosure regulations and subsequent passage a few years later in 2012 precipitated the reduction in the RPS fees, which RPS providers were willing (or required) to accept as a result of the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

48.     By the start of, and during the entire Class Period, the level of fees that RPS providers have been willing to accept for providing RPS, including RK&A services, has stabilized, and has not materially changed for large plans, including the Plan.  In other words,

reasonable RPS fees paid in 2018 are representative of the reasonable fees for RPS during the entire Class Period (meaning from 2014 to date).

49.     RPS providers prefer larger defined contribution plans, like the Plan, because they achieve economies of scale that lead to a reduction in the per-participant cost, as the number of participants in the plan increases.  This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  When the number of participants increases in a defined contribution plan, the RPS provider can spread the fixed costs of providing retirement plan services over a larger participant base, thereby reducing the average unit cost of delivering services on a per-participant basis.

50.     Importantly, the average cost to an RPS provider of providing services to a participant does not materially differ based on whether that participant has $10,000, $100,000 or $1,000,000 in plan assets in her or his account balance within the Plan.

51.     While the total cost to provide RPS increases as more participants join a plan, the cost per participant to deliver the RPS decreases.  Prudent plan fiduciaries, as well as their consultants and advisors, are aware of this cost structure dynamic for RPS providers.

52.     Sponsors of defined contribution plans negotiate and contract for RPS separately from any contracts related to the selection of investment management services provided to plan participants.

53.     A portion of the total expense ratio for the investment options selected by plan fiduciaries is usually allocated to the provision of services that the RPS provider provides on behalf of the investment manager.  As a result, RPS providers often make separate contractual arrangements with mutual fund providers.  RPS providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise

have to be provided by the mutual fund.  These fees are known in the defined contribution industry as "revenue sharing."

54.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RPS provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant).  That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

55.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants through investment expenses that is allocable to RPS and, in some cases, other services provided to a plan.  The difference between the total expense ratio and the revenue sharing is known as the "net investment expense."  When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager and is the metric used to determine the option that is in the best interest of participants, which is also known as the most "efficient" option.

56.     RPS providers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

57.     Regardless of the pricing structure that the plan fiduciaries negotiate with the RPS provider, the total amount of compensation paid to the RPS provider should be reasonable.

58.     As a result, plan fiduciaries must understand the total dollar amounts being paid to their RPS provider and be able to determine whether the compensation is reasonable by evaluating what the market is for the RPS being received by the plan.

59.     Because RPS fees are actually paid in dollars and because of the cost realities identified above, prudent fiduciaries evaluate the fees for RPS on a dollar-per-participant basis.

This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

60.     Prudent plan fiduciaries understand that, in general, a plan with more participants can and will receive a lower effective per-participant RPS fee than a plan with fewer participants.

**C.     The Plan**

61.     The Plan is a single-employer 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and substantially all administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various custom investment funds and a self-directed brokerage account.

62.     The Plan's investment alternatives are custom options that are designed by or on behalf of the Administrative Committee for investment by participants in the Plan and other Roche/Genentech retirement plans.  The custom investment funds are not mutual funds and, accordingly, are not regulated by the Securities and Exchange Commission ("SEC").

63.     Fidelity, which Defendants engaged, was the recordkeeper for the Plan throughout the Class Period.  As the recordkeeper, Fidelity is responsible for providing the RPS to the Plan and its participants.

64.     The RPS provided to the Plan by Fidelity are standard RPS identified above. There are no RPS provided to the Plan and its participants that are unusual or out of the ordinary.

65.     As described in more detail below, the Plan's Participant Fee disclosure documents indicate that the RPS fees were charged to participants on a per capita basis, plus any additional usage fees.  On the contrary, however, the Plan's Form 5500 state that the administrative fees were allocated on a *pro rata* basis.  For example, the Plan's 2018 Form 5500 specifically states that "[a]llocations of administrative expenses are based on account balances." Either the Form 5500 or the Participant Fee disclosure document is incorrect, and Defendants breached their fiduciary duties by failing to provide participants with full, complete and accurate information.  Upon information and belief, the discrepancy regarding the allocation of administrative expenses is attributable to the questionable and imprudent decision by the Plan's fiduciaries to use a Master Trust to hold the assets of the Plan, as discussed and described below.

66.     As also discussed below, the Plan's fiduciaries selected custom investment options for the Plan's participants and, in doing so, committed significant breaches of fiduciary duty.  The custom investment funds are not mutual funds and, accordingly, are not regulated by the SEC.

**D.     The Separate Master Trust holding the Plan's Assets**

67.     The Plan's fiduciaries have chosen to hold the Plan's assets in a Master Trust (the Roche U.S. Retirement Plans Master Trust), in which Plan assets are commingled with the assets of several other retirement plans.  The Master Trust is sponsored by Genentech.

68.     Master trusts have historically been utilized by plan fiduciaries to achieve "institutional pricing" of certain investment options but, given the increasingly competitive nature of the retirement plan markets, such institutional pricing now can easily be obtained by large plans, such as the Plan, without utilizing a master trust structure that adds unnecessary layers of fees to the plan and reduces the transparency of the fees being charged to the plan's assets.  Defendants' maintenance of the retirement assets in the Master Trust was an independent

breach of fiduciary duty because it caused the Plan to pay additional and unnecessary fees related to maintenance and administration of the Master Trust, as discussed below.

69.   The Master Trust structure significantly decreases the transparency related to the fees being charged by the recordkeeper, investment managers, and trustee of the separate Master Trust, as well as the transparency related to the reasonableness of fees being paid by participants in the Plan for investment management and other Administrative expenses incurred by the Master Trust and allocated to the Plan participants.

70.   For example, in 2018, the Master Trust paid fees to no less than nine service providers that received indirect compensation (*i.e.*, revenue sharing or the equivalent thereof), but, in its 2018 Form 5500, the Master Trust chose not to disclose any additional information about the fees earned by those service providers (including the amount of such indirect compensation) or any meaningful information about the services provided by them.

71.   The Master Trust disclosed Administrative Expenses (excluding "Investment advisory and management fees") of $5,865,762 in 2018.  In 2018, the Plan's assets comprised 68.59% of the assets of the Master Trust.  The Master Trust allocated administrative expenses relating to the Plan in proportion to the Plan's assets held in the trust.  Accordingly, the Plan's portion of those fees was $4,023,326.

72.   As a result, in 2018, the Plan's participants paid at least $119.41 per participant for the "Administration" of the investment options available to them.  This charge is shocking and could not be justified by any reasonable fiduciary because it essentially amounts to an unjustifiable addition to RK&A expenses above and beyond the excessive RK&A fees paid by the Plan (discussed fully below).  This is in addition to the RPS fees paid by Plan participants.  Moreover, the $4,023,326 does not include the additional indirect compensation paid to service providers of the Master Trust (the amount of which is not disclosed to Plan participants).

73.     Plan participants did not benefit from the extra $4,023,326 in administrative expenses that they paid in 2018 or the administrative expenses related to the Master Trust and paid by Plan participants during the entire Class Period – which administrative expenses are above and beyond the excessive RPS fees the Plan paid to Fidelity.

74.     In 2018, the Master Trust also disclosed that Fidelity Institutional Asset Management received over $2.8 million dollars in direct compensation and collected an undisclosed amount of indirect compensation from the Master Trust for investment management services provided to the Master Trust.  Yet, Plan participants have no ability to understand which investment options made available to them, if any, were managed by Fidelity itself.  Making matters worse, Plan participants received no meaningful disclosures regarding the indirect compensation paid to this Plan service provider.  Indeed, it appears that none of the Plan's significant investment options were actually managed by Fidelity but, nevertheless, the Plan shouldered almost 70% of this expense, thereby seemingly subsidizing investment management expenses for other Roche retirement plans.  Defendants' use of the Master Trust structure and their permitting the Plan to indirectly subsidize the expenses of other Roche retirement plans amounted to a breach of the duty of loyalty.

75.     Since the Master Trust contains Plan assets, the Plan's fiduciaries have a duty to understand all the fees and services related to the administration of the Master Trust.  Yet, the investment management fees charged by Fidelity Institutional Asset Management do not appear to have any connection to services provided with respect to Plan assets.  Since there is no indication that Fidelity Institutional Asset Management performs any significant direct services for the Plan, it appears that Defendants permitted the Plan to pay approximately $2 million in fees for little or no services in 2018.  Review of the Master Trust's filings reveals that the Plan likely paid similar excessive and unjustifiable fees during each year of the Class Period.

76.     In the Master Trust's 2018 Form 5500, the Master Trust disclosed that Fidelity Institutional Asset Management also earned indirect compensation based on investment management services provide to the Master Trust but did not disclose the amount of indirect compensation in its Form 5500 filing.

77.     In light of the opacity of the disclosures related to the Master Trust, among other things, it is not possible to determine how much indirect compensation (including revenue sharing) Fidelity Institutional Asset Management received or the full amount of compensation that was earned by this Fidelity entity.

78.     Since Fidelity Institutional Asset Management does not appear to have performed any direct services for the Plan or its participants, the amount of fees (both direct and indirect) paid to this Fidelity entity were excessive and constituted a breach of fiduciary duty.

**E.     Standard of Care Under ERISA**

79.     When selecting and monitoring service providers or investment options, Plan fiduciaries are required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

80.     The standard of care for Plan fiduciaries changes and evolves over time because, among other things, new information becomes available, retirement plan providers develop new capabilities and efficiencies from technological advances, new laws and regulations are passed, and market dynamics change.

81.     There have been tremendous changes in the market environment for retirement plans since 2000, including the Pension Protection Act of 2006 ("PPA"), Pub. L. 109-280, as well as regulatory disclosure requirements, among other things.

82.     The standard of care is influenced by retirement plan professionals, such as retirement plan advisors and consultants, in conjunction with plan fiduciaries as they develop best practices and methodologies that serve to ensure that fiduciaries act in the exclusive best interest of plan participants and pay only reasonable fees for the services received, among other things.

83.     As a result, the standard of care is not static and involves a highly factual and case specific analysis.  The standards of care applicable in this case are dynamic and constantly evolving and, therefore, require an examination of the actual practices of retirement plan professionals, as well as an examination of whether the practices have the effect of improving outcomes for participants.

### 1.     Selecting & Monitoring Service Providers

84.     Plan fiduciaries are required to fully understand all sources of revenue received by RPS providers. Fiduciaries must regularly monitor the revenue being paid to RPS providers to ensure that the compensation received is and remains reasonable in view of the services being provided.  This includes all the revenue received by RPS providers -- even if the revenue is generated outside the Plan -- if the basis and opportunity of the revenue is the result of the Plan's relationship with the RPS provider.  This is so because it increases the ability of the Plan to ensure the fees are reasonable in light of the entire relationship.

85.     The DOL has opined that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[3]

---

[3]*See A Look at 401(k) Plan Fees*, *supra* note 1, at 2.

86.     The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[4]

87.     By 2013, prior to the class period, the impact of the 2012 Fee Disclosure regulations was incorporated into the standard of care and was well known, understood, and established among prudent plan fiduciaries based on the DOL guidelines, case law, and best practices as shared by retirement plan professionals.  For example, in its 2013 publication, "DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance," Mercer LLC summarized the standard of care exercised by prudent retirement plan professionals and plan fiduciaries as follows:

1. Price administrative fees on a per-participant basis.
2. Benchmark and negotiate recordkeeping and investment fees separately.
3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.
5. Negotiate vendor contracts to ensure that service standards and liability provisions are in the best interest of plan participants and beneficiaries.
6. Monitor actual fees paid against contractual requirements.
7. Review services annually to identify opportunities to reduce administrative costs.[5]

88.     As a result, court decisions opining on ERISA requirements in a specific case covering facts that took place at times in the past have limited application to what ERISA requires of plan fiduciaries during the Class Period since the standard of care evolves over time

---

[4] *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, INVESTMENT COMPANY INSTITUTE at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

[5] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, MERCER INVESTMENT CONSULTING, at 3-4 (2013).

and has been impacted by, *inter alia*, the 2012 Fee Disclosure regulations and enhancements in the capabilities of RPS providers.

89.     In its 2013 publication, Mercer went on to discuss the importance of monitoring transaction fees, such as brokerage fees, stating:

> In addition to basic recordkeeping fees, recordkeepers often charge for participant-initiated transactions and services such as loans, withdrawals, domestic relations orders, and brokerage accounts
>
> . . .
>
> It makes sense to review transaction-based fees as part of the ongoing fee review, and these fees should be considered in any negotiations to reduce the overall cost structure.   Sponsors that subsidize recordkeeping costs must consider whether negotiated fee reductions should be applied to overall administrative costs, transaction fees, or both.  *Id*. at 6.

90.     In other words, prudent fiduciaries take into consideration the additional revenue and profit potential available to the RPS provider through the brokerage offering, as well as any potential cost reductions when negotiating the effective per-participant RPS fee rate.  As a result, the existence of the brokerage services has a positive (or, at worst, immaterial) impact on the effective per-participant RPS fee rate charged to large plans like the Plan.  Thus, any attempt to justify excessive RPS fees on the basis of brokerage or other services is disingenuous at best.

91.     Additionally, as noted by Mercer above, prudent plan fiduciaries will ensure that a plan is paying no more than reasonable fees for RPS by soliciting competitive bids (benchmarking) from other RPS providers to perform the same services currently being provided to the plan.  This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries.  For plans with many participants, like the Plan, some RPS providers only require the number of participants to provide a quote for RPS, while others might also require the amount of assets.  But, importantly, RPS providers require nothing more in recognition of the fact that RK&A services are essentially uniform in nature and the minor differences in services provided

are either immaterial to the cost of such services or function as separate profit centers for RPS providers (like the brokerage window provided to the Plan by Fidelity).

92.     Prudent fiduciaries know the number of participants and the amount of assets in their plan and can, therefore, easily receive a quote from other RPS providers to determine if the current level of fees being charged to the plan is reasonable.

93.     Having received quotes, if necessary, a prudent fiduciary can then negotiate with its current provider for a lower fee or move to a new RPS provider to provide the same (or better) services for a competitive (or lower) reasonable fee.  Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants, as well as any other service providers.

94.     After the RPS provider's revenue requirement is negotiated, the plan fiduciary then determines how to pay the negotiated RPS fee.  The employer/plan sponsor can pay the RPS fees on behalf of participants, which is the most beneficial to plan participants.  If the employer is paying the fee, the employer has a strong interest in negotiating the lowest fee a suitable RPS provider would accept.  Typically, however, as here, the employer decides to have the plan (i.e., participants) pay the RPS fees.  If the RPS fees are paid by participants, the fiduciaries can allocate the negotiated RPS fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

95.     By the beginning of the Class Period, prudent fiduciaries implement three related processes to prudently manage and control a plan's RPS costs.

96.     First, fiduciaries must pay close attention to the recordkeeping fees being paid by the Plan.  A prudent fiduciary tracks the RPS provider's expenses by demanding documents that summarize and contextualize the RPS provider's compensation, such as fee transparencies, fee

analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

97.     Second, to make an informed evaluation as to whether an RPS or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing, being paid to the plan's RPS provider, as well as any revenue earned outside the plan from the plan's relationship with the RPS provider (like the fees earned through the brokerage window).

98.     To the extent that a plan's investments pay asset-based revenue sharing to the RPS provider, prudent fiduciaries monitor the amount of the payments to ensure that the RPS provider's total compensation from all sources does not exceed reasonable levels and require that any revenue-sharing payments that result in total payments exceeding a reasonable level be returned to the plan and its participants.

99.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans and enhancements to the services being offered in the market by other providers of RPS.  This will often include conducting a request for proposal ("RFP") process at reasonable intervals – usually once every three years.

100.     As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for RPS, as well as all the different fee components related to both the RPS and the investment options selected and made available to plan participants.

101.     As noted above, however, by merely soliciting quotes from other RPS providers, plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation.  Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids

through some process, be it formal or informal, that provides an incentive to RPS providers to provide a competitive bid.

102.    All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period.  This is because prudent fiduciaries understand that excessive fees significantly and negatively impact the value of participants' retirement accounts.

103.    As discussed in detail below, Defendants have breached their fiduciary duties of prudence and/or loyalty to the plan related to the selection and monitoring of its RPS provider, Fidelity, thereby paying excessive and unreasonable fees.

## 2.    Selecting & Monitoring Investments

104.    For all practical purposes, there is a commonly accepted process to select and monitor investment options, which is based on modern portfolio theory and the prudent investor standard.  Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

105.    That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the fees.

106.    When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

107.    If a plan fiduciary chooses an active investment option, when an alternative index option is available, the plan fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the index warrants the higher fees

charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants.  This reflects the existing standard of care for plan fiduciaries throughout the Class Period.

108.    If a plan fiduciary chooses an active investment option when an alternative index option is available, but the plan fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index, in light of the higher fees, warrants the risk of underperformance and is in the best interest of plan participants, then the plan fiduciary has acted unreasonably and imprudently, based upon the existing standard of care throughout the Class Period.

109.    Prudent ERISA fiduciaries monitor the performance of the investments in a retirement plan based upon appropriate benchmarks (including, but not limited to, alternative investments available in the marketplace) on a three-year and five-year rolling basis, and the standard of care for fiduciaries requires them to replace investments that perform poorly relative to their benchmarks and/or peer groups for a sustained period of time.  Likewise, no competent fiduciary or investment professional would utilize a performance period of more than three to five years of trailing performance in recognition of the average length of market cycles and because utilizing longer performance metrics beyond such a period of time creates too great a risk of significant and unrecoverable losses to Plan participants, based upon the realities of compounding and fundamental investment philosophy.

**F.    Defendants' Violations of ERISA**

110.    As discussed in detail below, Defendants have breached their fiduciary duties of prudence and loyalty to the Plan.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.  The Plan's Excessive Retirement Plan Service Fees

111.    During the Class Period, Plan participants paid for the RPS provided by Fidelity both directly through fees deducted from their accounts and indirectly through the revenue sharing paid by the Master Trust but effectively hidden from the Plan's participants.

112.    The fees directly deducted were comprised primarily of a "recordkeeping fee" of $38 per year,[6] plus other fees related to loans, self-directed brokerage services, and other ancillary fees.  The direct amounts extracted from participant accounts for this common bundle of RPS provided by Fidelity were as follows:

| Retirement Plan Services (RPS) Fees | | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | *Average* |
| Participants | 32,232 | 33,238 | 33,638 | 33,693 | 34,178 | *33,396* |
| Est. RPS Fees | $1,982,325 | $2,358,965 | $1,677,585 | $1,533,555 | $1,460,285 | *$1,802,543* |
| Est. RPS Per Participant | $62 | $71 | $50 | $46 | $43 | *$54* |

113.    Fidelity also received an undisclosed amount of indirect revenue in addition to the amounts set forth above.  In other words, Fidelity disclosed that it received indirect compensation for services provided to the Plan, but the Plan did not disclose the amount of indirect compensation received by Fidelity and, due to the Master Trust structure, it is impossible for Plan participants to determine the full amount that Fidelity earned.  Therefore, the revenue earned by Fidelity for providing RPS to the Plan was greater than the amounts set forth above. In sum, since, as detailed below, the Plan paid grossly excessive direct fees and also paid undisclosed indirect compensation, Defendants have engaged in an apparent breach of their fiduciary duties throughout the entire Class Period.

114.    Set forth below are the RPS Fees paid by a number of other defined contribution plans with a similar number of participants as the Plan, which represent the prices available to

---

[6]As of late 2014 or early 2015, the base per participant charge was $42 and, therefore, in 2014, the RPS fees were even higher.

the Plan during the Class Period in the market for RPS.  The RPS fees in the table are apples-to-apples comparisons in that they include all the fees being charged for RPS by each of the various national recordkeepers for each of the comparable plans.

115.    The RPS fees calculated for each plan include all the direct compensation for RPS disclosed on the Form 5500, as well as the appropriate amount of indirect compensation. Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RPS fees for each plan.  In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the RPS fees.  In other plans, all of the revenue sharing is returned to the plan and is therefore not included in the RPS fee calculation.

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RPS Fee | RPS Price /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| **Sutter Health Retirement Income Plan** | **13,248** | **$406,000,195** | **$460,727** | **$35** | **Fidelity** | **Blue** |
| **Fortive Retirement Savings Plan** | **13,502** | **$1,297,404,611** | **$472,673** | **$35** | **Fidelity** | **Blue** |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $516,000 | $32 | Voya | White |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight | White |
| **U.S. Roche 401(K) Savings Plan Average Fee** | **33,526** | **$7,761,344,543** | **$1,745,500** | **$52** | **Fidelity** | **Red** |
| Kindred 401(k) | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price | White |
| The Savings And Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard | White |
| Deseret 401(K) Plan | 34,357 | $3,380,994,203 | $873,028 | $25 | Great-West | White |
| **Danaher Corporation & Subsidiaries Savings Plan** | **35,757** | **$4,565,702,706** | **$988,267** | **$28** | **Fidelity** | **Blue** |
| Tesla, Inc. 401(K) Plan | 39,720 | $436,703,925 | $1,178,160 | $30 | Fidelity | White |
| The Dow Chemical Company Employees' Savings Plan | 40,596 | $10,766,545,647 | $1,322,048 | $33 | Fidelity | White |
| **Publicis Benefits Connection 401K Plan** | **42,316** | **$2,547,763,175** | **$1,167,408** | **$28** | **Fidelity** | **Blue** |
| Advocate Health Care Network Retirement Savings Plan 401(K) | 44,893 | $2,954,809,557 | $1,421,458 | $32 | Alight | White |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard | White |

[1]Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available.

116.    As is shown in the table above, the average fee paid by the Plan is much higher than the comparable plans with both more and less participants.  Indeed, as of 2014, the Plan could have paid as little as $30 per participant for RPS if Defendants had taken their responsibilities seriously and fulfilled their duties to ensure that the Plan only paid reasonable

expenses to its services providers.  Instead, the Plan paid, on average, $24 per participant more than it should have throughout the Class Period, *plus the amount of undisclosed revenue sharing and other indirect compensation paid to Fidelity.*  Once the amount of Fidelity's revenue sharing is disclosed in discovery, Plaintiff likely, and quite plausibly, will learn that Defendants paid over twice the amount that they should have for RPS with reasonable and competent fiduciaries at the helm.

117.    In addition, as discussed above, as a result of the Master Trust structure, the Plan paid additional administrative fees of $119.41 per participant in 2018 and paid similarly high amounts for such unnecessary Master Trust "services" in each year of the Class Period.  When the almost $120 per participant administrative fees are added to the average per participant fee of $54 during the Class Period, it becomes obvious that the Plan paid almost six (6) times the amount that it should have for RPS.

118.    The graph below visually illustrates the data in the table above.  First, the blue data points represent the effective per participant RPS fee rate paid by other plans that use Fidelity as their recordkeeper and also use brokerage services.  The white data points represent the effective per participant RPS fee rate paid by other plans that use other national recordkeepers and do not use brokerage services.

119.    As explained above in discussing the standard of care for selecting and monitoring service providers, the graph illustrates that there is no material difference between the RPS fees of the plans that use brokerage services compared to those that do not.

120.    The grey trend line is generated using the blue and white data points and represents an estimate, based on the actual RPS fees of comparable plans, of what fee level could be obtained by plans following the standard of care described above from a variety of national

RPS providers, who would have provided the same quality and level of services required by the Plan during the Class Period.



121.    These actual market data points and the trend line demonstrate that many national recordkeepers, including the Plan's recordkeeper Fidelity, can and would provide the exact same RPS to the Plan for an RPS fee averaging around $30 per participant from 2015 through 2019. Instead, however, from 2015 through 2019 the Plan paid an average of $54 per participant.  The Plan also could have paid an RPS fee of $30 in 2014 but, as explained above, paid even more in that year.

122.    Based on the fees paid by both other plans receiving the exact same RPS and using the exact same recordkeeper (Fidelity), as well as the fees paid by the several other plans that received the market rate for the standard bundle of RPS provided to the Plan, it is reasonable to infer that the Plan fiduciaries did not follow a prudent process to ensure that the Plan's RPS

fees were reasonable.  There is no other reasonable or plausible explanation for the 80% premium on the RPS paid by the Plan – without even taking into account the undisclosed amount of revenue sharing that, once discovered, will confirm that Defendants paid even more.  Indeed, the Plan's Fee Policy Statement indicates that the Plan has a "most favored nations" provision with Fidelity, but Defendants clearly failed to enforce that provision in violation of their fiduciary duties because other similarly situated plans paid Fidelity much less for the same services during the same time period.

123.    Defendants did not regularly and/or reasonably assess the Plan's RPS fees being paid to Fidelity.  In light of the amounts paid, Defendants could not have engaged in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Fidelity vis-à-vis the fees that other RPS providers would charge for the same services.

124.    Defendants knew or should have known that ERISA's duties of loyalty and prudence required them to consider and seek quotes from other RPS providers and to engage in processes to evaluate the reasonableness of the Plan's RPS fees but, upon information and belief, Defendants simply failed to do so.  Had Defendants done so in any reasonably competent manner, they would have concluded that the RPS fees the Plan was paying were unreasonable and excessive relative to the services received.

125.    Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RPS fees and their failure to take effective remedial actions shows a lack of, or a complete disregard for, participant loyalty and a prudent process, and was a breach of their fiduciary duties to Plaintiff and the Plan participants.

126.    To the extent there was a process in place that was followed by Defendants, it was imprudent and ineffective given the objectively unreasonable RPS fees paid by the Plan.

127.    Had Defendants monitored the compensation paid to Fidelity and ensured that participants were only charged reasonable RPS fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six years.

128.    Due to Defendants' fiduciary failures and the absence of a prudent fiduciary processes to monitor fees for reasonableness, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in prudent processes, and they were significantly higher than RPS fees assessed to participants in similar plans.

## 2.    <u>The Objectively Imprudent Roche Target Date Funds</u>

129.    A number of the Plan's most important investment options are objectively imprudent, separate and apart from the apparent excesses with respect to the Plan's recordkeeping and administrative fees, as well as its relationship with Fidelity.

130.    The Plan lineup offers a suite of nine custom target date funds (the "Roche TDFs"). A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches. Target date funds offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation. Target date managers make changes to the allocations to stocks, bonds, alternative investments, and cash over time. These allocation shifts are referred to as a fund's glide path.

131.    The Roche TDFs are advised by Russell Investment Management Company ("Russell") for the exclusive investment of Roche/Genentech plan participants. Defendants have a long-standing relationship with Russell, which provides investment management services to the Plan through the Master Trust and which is paid millions of dollars in compensation for various services that Russell provides to various retirement plans within the Master Trust.

132.     The Roche TDF suite commenced operations on September 27, 2012. The objective of each vintage, per the Roche TDF fact sheets, is to "provide capital growth and income consistent with its current asset allocation, which will change over time, with an increasing allocation to fixed income funds."  The underlying portfolio of each target date fund is comprised of multiple Roche Core Funds[7] ("Core Funds"), as well as several of the Core Funds' underlying single manager portfolios.  The Administrative Committee is charged with the selection of the investment managers featured in the Core Funds, and Russell is responsible for the construction and implementation of the Roche TDF glide path.

133.     Based upon the investment components and glide path of the Roche TDFs, it is apparent that use of the word "custom" is a misnomer.  That is because the Roche TDFs function in the same manner as "off-the-shelf" target date funds and do not appear to account for any specialized demographics or preferences of Plan participants.  The only material difference between the Roche TDFs and a number of off-the-shelf target date funds, as discussed below, is that the Roche TDFs are terrible performers relative to their peers and are advised by an investment manager known for its poor performance in the target date fund market – but an investment manager with which Defendants maintain other business relationships, thereby placing Defendants' loyalty in substantial question..

134.     Defendants' decision to select and retain Russell to make the critical decisions on the appropriate asset mix for the Roche TDFs was and remains dubious given Russell's reputation and lack of standing in the target date fund market.  The firm's initial foray into target date funds lasted about a decade.  The Russell LifePoints Target Date Series (the "LifePoints Series") was liquidated in 2017 because it "never gained a meaningful foothold in the target date

---

[7]The Core Funds are custom investment options designed by the Administrative Committee for the exclusive investment of Roche/Genentech plan participants. The Core Funds include investment alternatives from six major asset classes. Several of the Core Funds contain multiple styles and strategies.

space."[8]  Morningstar's final analysis report on the LifePoints Series highlighted the suite's substantial performance concerns,[9] and attributed the poor long-term results to several of Russell's dubious asset allocation decisions.  The Roche TDFs mirror the poor performance of the LifePoints Series and appear to reflect a similarly poor approach to asset allocation.

135.   Defendants clearly knew or should have known that the Roche TDFs were being advised by Russell, an entity that was known for being poor in its approach to target date funds.

136.   Since the failure of its mutual fund target date offering, Russell has exited the retail target date market and has offered a collective trust version of the LifePoints Series that is exclusively available to institutional investors and a custom target date glide path design service, which it provides to the Plan.  Given its uninspiring asset allocation track record, it is unsurprising that few retirement plans utilize Russell's glide path construction service.  Indeed, according to a publicly available response to a RFP related to the target date fund manager for the San Francisco Deferred Compensation Plan (the "SFDC Plan"), as of September 2015, Russell had just four custom target date fund clients.  In early 2016, one of those four clients terminated the relationship.  The Plan has used Russell's custom target date services since 2012; accordingly, in early 2016, it appears that just two other plans entrusted the design of their glide paths to Russell.  Defendants knew or should have known that plan sponsors had voted with their feet by abandoning or failing to engage Russell; yet Defendants retained Russell to be the steward for the critical Roche TDFs which, as explained below, functioned as the Plan's Qualified Default Investment Alternative ("QDIA").

---

[8]Morningstar Target Date Fund Series Report: Russell LifePoints Target Date Series, June 30, 2017.

[9]Returns of the funds in the LifePoints Series ranked, on average, in the bottom third of their respective peer groups over the trailing five- and ten-year periods.

137.    The trend for sponsors of large retirement plans, according to Jake Gilliam, head of multi-asset solutions at Charles Schwab, has been toward off-the-shelf target date funds and away from custom solutions like those that Russell offers, due to a desire to keep costs and complexity to a minimum.[10]

138.    Defendants were responsible for crafting the Plan lineup and could have chosen any off-the-shelf target date family but, in electing to create the Roche TDFs and entrust the asset allocation decisions to Russell, instead made the imprudent decision that has cost Plan participants significant growth in their retirement assets, resulting in losses of millions of dollars. Defendants need not have scoured the market to find an appropriate alternative target date suite; participant retirement savings would have been remarkably augmented by investing in any of the top available target date families.  Target date fund assets are heavily concentrated among a handful of proven managers, any of which provide a clearly superior option to the Roche TDFs.

139.    In creating and retaining the Roche TDFs, Defendants clearly failed to carry out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants.  Instead, it appears that Defendants acted based upon their other business relationships with Russell.  Indeed, based upon the cross-subsidization issues identified in the Master Trust vis-à-vis Fidelity, it is plausible that the Plan has been indirectly subsidizing services by Russell to other non-Plan components of the Master Trust.  Had Defendants acted in the sole interest of Plan participants by, for example, simply weighing the benefits of the Roche TDFs against the most widely utilized target date fund suites, Defendants would inevitably have come to the conclusion that, through both their selection of the underlying investment managers[11] and Russell's poor glide path management, the Roche TDFs represented a

---

[10]Lee Barney, *Benchmarking Custom TDFs Is Not an Exact Science*, PLAN SPONSOR (Feb 23, 2021), https://www.plansponsor.com/in-depth/benchmarking-custom-tdfs-not-exact-science/.

[11]The Roche TDFs' underlying positions are primarily in funds designated by or on behalf of the

substandard option and were, therefore, inappropriate for inclusion and maintenance in the Plan lineup.

140.    Exacerbating Defendants' imprudent choice to add and retain the Roche TDFs is the suite's role as the Plan's QDIA for as long as it has been an option in the Plan investment menu.  A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA.  Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA.  The Roche TDF with the target year that is closest to a participant's assumed retirement age (age 65) has served as the QDIA in the Plan throughout the pertinent period.

141.    Given that the vast majority of plan participants in general, of which the Plan participants are no exception, are not sophisticated investors, they largely, by default, concentrate their retirement assets in target date funds.  As such, the impact of Defendants' imprudent selection of target date funds is magnified vis-à-vis other asset categories.  Indeed, throughout the Class Period, approximately 63%-67% of the Plan's assets were invested in the Roche TDFs.

i.    The Limitations of the Custom Benchmark

142.    Custom target date solutions like the Roche TDFs face "a high bar to be able to add value, net of all the administrative costs,"[12] particularly those relating to benchmarking and participant education.  To benchmark the performance of the Roche TDFs, the Administrative Committee utilizes the Roche Target Date Fund Index, a composite benchmark for each target

---

Administrative Committee.  This feature is to the potential detriment of participants invested in the custom target date suite, as even best-in-class funds "don't always play well together and complement each other," according to Sue Walton, senior retirement strategist at Capital Group. *See Benchmarking Custom TDFs Is Not an Exact Science*, *supra* note 10.

[12]*Benchmarking Custom TDFs Is Not an Exact Science*, *supra* note 10.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

date that mirrors the overall strategy of the Roche TDFs.  The composition of this benchmark, which presumably contains a weighted mix of the market indices by which the underlying components of the Roche TDFs are judged, is opaque to participants, rendering them unable to fully scrutinize the performance of their investment choices.  Moreover, to put it mildly, custom benchmarks are imperfect as an evaluative tool, because they fail to demonstrate how the investment is performing relative to peers.[13]  Rather than demonstrate the success of the Roche TDFs in the broader target date market, as, for example, can be achieved (and is commonly performed) by utilizing the S&P 500 Index to benchmark a large cap equity fund, the Roche Target Date Fund Index merely reflects the Roche TDF suite's ability to execute its own particular strategy – in this case, a terrible one managed by Russell.  Thus, it is incumbent on plan sponsors and a component of the existing standard of care throughout the Class Period, to also assess their custom investments against those readily available alternatives to ensure that participants are best served by the options available to them – rather than simply executing a terrible investment strategy, as was the case here for the Roche TDFs.

17
18
19
20
21
22
23

143.    Russell's own Defined Contribution Solutions brochure stresses that "for the majority of your participants, target date fund performance will determine retirement outcomes." Thus, it is unfortunate that Defendants' decisions concerning the creation, design, and implementation of the Roche TDFs have yielded a product that provides returns dwarfed by the most popular off-the-shelf target date funds (the "Off-the-Shelf TDFs"), as well as the most common benchmark used to approximate the performance of the target date fund industry.

24

ii.    The S&P Target Date Indices

25
26

144.    According to Morningstar, the S&P Target Date Indices (the "S&P Indices"), which include a separately calculated index for each target date, are the most widely used by

27
28

---

[13]*See id.*

target date providers.  Each index "measures the performance of sub-indices selected and weighted to represent a consensus of the opportunity set available in the U.S. universe of target date funds."[14]  Measured against this broad universe of investable alternatives, the Roche TDFs fall short and did so throughout the Class Period.  The Roche TDFs commenced operations in late 2012.  The suite's calendar year returns in each year of its existence pale in comparison to the S&P Indices.[15]

| Roche TDF Annual Outperformance vs S&P Target Date Indices | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Target Date | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Retirement | -0.94% | -0.17% | -1.61% | 0.88% | 1.03% | -0.43% | 1.24% | 3.61% |
| 2020 | -6.37% | -1.12% | -1.79% | -1.02% | -2.33% | 0.93% | -1.73% | |
| 2025 | -5.11% | -1.25% | -2.23% | -1.14% | -2.01% | 0.80% | -1.97% | 0.50% |
| 2030 | -2.93% | -1.41% | -2.74% | -1.15% | -1.27% | 0.53% | -1.88% | -0.25% |
| 2035 | -1.02% | -1.76% | -3.31% | -1.13% | -0.10% | 0.04% | -1.33% | -0.91% |
| 2040 | -2.37% | -1.67% | -3.38% | -0.27% | 2.00% | -1.09% | 0.17% | -0.98% |
| 2045 | -3.41% | -1.74% | -3.31% | -0.47% | 1.92% | -1.53% | 1.03% | -1.30% |
| 2050 | -4.40% | -1.76% | -3.33% | -0.64% | 1.31% | -1.32% | 0.66% | -1.43% |
| 2055 | -5.12% | -1.71% | -3.24% | -0.81% | 1.00% | -1.33% | 0.55% | -1.23% |

145.    Indeed, there is not a single year in which the Roche TDFs manage to outperform the S&P Indices across each vintage.  The suite's performance shortfall is further reflected in its five-year annualized returns, shown below, and compared to the S&P Indices as of the end of 2017, the first date for which the Roche TDFs have a calculable five-year return.  For the sake of brevity, the same charts comparing the five-year annualized returns for the end of 2018, 2019, and 2020 are attached as Exhibit 1.  These charts demonstrate the same consistent disparity in performance.

---

[14]S&P Target Date Index Series Methodology. January 2021.

[15]There is no 2020 return for the Roche 2020 TDF because it merged into the Roche Retirement TDF during that year.

1
2
3
4
5
6
7
8
9



10

iii.    The Off-the-Shelf TDFs

11

12    146.    The Roche TDFs' underperformance is even more dramatic when compared to a

13 peer group containing the most popular off-the-shelf target date funds, each of which was an

14 alternative readily available to the Plan at all times during the Class Period.  The suites

15 comprising the Off-the-Shelf TDFs[16] represent the six largest investment managers by total

16 assets in the target date space.  This peer group held a combined 81% of all target date assets as

17 of 2018 and includes suites representative of the different target date fund objectives ("to" versus

18
19
20
21

22 ─────────────────

[16]The Off-the-Shelf TDFs consist of the Vanguard Target Retirement Fund suite (the "Vanguard

23 TDFs"), the T. Rowe Price Retirement Fund suite (the "T. Rowe Price TDFs"), the American
Funds Target Date Retirement Fund suite (the "American TDFs"), the Fidelity Freedom Fund suite

24 (the "Fidelity TDFs"), the JPMorgan SmartRetirement Fund suite (the "JPMorgan TDFs"), and
the BlackRock LifePath Index Fund suite (the "BlackRock TDFs.")  At least one of these

25 investments (the Fidelity TDFs) also would have been an imprudent choice in light of other
alternatives available from Fidelity and, as a result, that option has lost significant assets since

26 undertaking a strategy overhaul in 2014.  Nevertheless, the Plan would have been substantially
better off if it had chosen the Fidelity TDFs, even though there were much better Fidelity TDF

27 investments available at the time, thereby confirming the awful nature of the Roche TDFs – which
was apparent (or should have been apparent) in "real time" to Defendants throughout the Class

28 Period.

"through"[17]) and management styles (active versus passive).[18]  The Off-the-Shelf TDFs represent an ideal peer benchmark, which the Plan's own Investment Policy Statement ("IPS") calls for, against which to evaluate the returns generated by the custom TDFs.  Had Defendants engaged in any such examination, they would have found that the retirement savings of Plan participants would be significantly better off invested in any of the Off-the-Shelf TDFs.

147.    Scrutiny of the annual returns of the Roche TDFs for each calendar year of their existence paints a disconcerting picture.  Tables containing the performance data for each vintage of the Roche TDFs and the Off-the-Shelf TDFs are attached as Exhibit 3.  Bar charts depicting the same data are attached as Exhibit 4.  As an example, the table and chart for the 2025 vintage of each target date suite is displayed below.

| 2025 Fund Annual Returns | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Roche Target Date 2025 | 11.92% | 4.31% | -2.48% | 6.68% | 12.54% | -4.22% | 16.41% | 11.72% |
| Vanguard Target Retirement 2025 Inv | 18.14% | 7.17% | -0.85% | 7.48% | 15.94% | -5.15% | 19.63% | 13.30% |
| T. Rowe Price Retirement 2025 Inv | 20.78% | 5.84% | -0.17% | 7.55% | 17.68% | -5.62% | 20.95% | 14.69% |
| American Funds 2025 Target Date R6 | 23.76% | 6.66% | 0.13% | 7.36% | 15.32% | -3.47% | 17.85% | 13.67% |
| Fidelity Freedom 2025 K | 16.50% | 5.63% | -0.16% | 7.47% | 16.87% | -5.81% | 19.57% | 14.68% |
| JPMorgan SmartRetirement 2025 R6 | 17.07% | 7.45% | -0.89% | 6.19% | 16.43% | -6.48% | 18.66% | 11.89% |
| BlackRock LifePath Index 2025 K | 13.48% | 6.47% | -0.45% | 6.87% | 14.43% | -4.78% | 18.98% | 12.42% |

---

[17]Certain target date funds are designed to change the asset mix only up until the presumed retirement date and then remain fixed thereafter (a "to" fund); others continue to shift the allocations through retirement (a "through" fund).

[18]A breakdown of the objective and management style of each of the Off-the-Shelf TDFs is provided on Exhibit 2.



148.    The Roche TDFs' persistently poor performance was not limited to the 2025 vintage.  The table below displays the average rank out of the collective seven target date options of the Roche TDFs and each Off-the-Shelf TDF suite, and indicates that the Roche TDFs have the worst annual returns across each vintage, except for the Retirement fund.[19]

| Average Rank of Annual Returns from 2013-2020 (ranked 1 to 7) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TDF Suite | Ret | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
| Roche | 3.50 | 6.00 | 6.25 | 6.13 | 6.25 | 5.63 | 5.50 | 5.63 | 5.88 |
| Vanguard | 3.50 | 3.57 | 3.25 | 3.63 | 3.75 | 3.88 | 4.00 | 4.50 | 4.50 |
| T. Rowe Price | 2.88 | 2.57 | 2.38 | 2.75 | 3.50 | 3.25 | 3.13 | 3.00 | 3.13 |
| American | N/A | 2.71 | 3.00 | 2.75 | 1.88 | 2.25 | 2.63 | 2.25 | 2.25 |
| Fidelity | 5.00 | 3.57 | 3.63 | 3.25 | 3.13 | 3.38 | 3.75 | 3.75 | 3.75 |
| JPMorgan | 3.63 | 4.57 | 4.88 | 4.88 | 4.88 | 4.88 | 4.75 | 4.75 | 4.75 |
| BlackRock | 2.38 | 4.67 | 4.63 | 4.63 | 4.63 | 4.63 | 4.13 | 4.00 | 3.75 |

149.    The five-year annualized returns reveal the true breadth of the gap between the Roche TDFs and the Off-the-Shelf TDFs.  Again, the Roche TDFs have had a calculable five-year return since 2017.  As of the end of every year, across every vintage other than the Retirement Fund, the trailing five-year performance of the Roche TDFs ranks dead last compared to the Off-the-Shelf TDFs.  Tables containing the performance data for each vintage of

---

[19]American Funds does not offer a Retirement Fund; accordingly, the Retirement Fund ranks are out of six TDF suites instead of seven.

1
2
3

the Roche TDFs and the Off-the-Shelf TDFs are attached as Exhibit 5.  Bar charts depicting the same data in a different format are attached as Exhibit 6.  As an example, the table and chart for the 2035 vintage of each target date suite is displayed below.

| 2035 Fund Five-Year Annualized Returns | | | | |
|---|---|---|---|---|
| | 4Q17 | 4Q18 | 4Q19 | 4Q20 |
| Roche Target Date 2035 | 8.75% | 3.41% | 6.58% | 9.81% |
| Vanguard Target Retirement 2035 Inv | 10.90% | 6.41% | 7.81% | 11.11% |
| T. Rowe Price Retirement 2035 Inv | 11.53% | 5.18% | 8.46% | 11.90% |
| American Funds 2035 Target Date R6 | 12.13% | 5.95% | 8.99% | 12.44% |
| Fidelity Freedom 2035 K | 11.04% | 5.11% | 8.60% | 12.16% |
| JPMorgan SmartRetirement 2035 R6 | 10.77% | 4.50% | 7.22% | 10.48% |
| BlackRock LifePath Index 2035 K | 9.64% | 4.86% | 7.87% | 10.81% |



150.    Measured against appropriate, available alternative target date suites, the Roche TDFs are a clearly inferior retirement solution.  Per the Plan's IPS, the Administrative Committee was tasked with periodically monitoring the performance of each Plan investment option relative to a specified benchmark and an "investment manager universe composed of professionally managed funds."  Regarding performance standards, the IPS dictates that the Administrative Committee consider rolling three- and five-year periods, as is standard for virtually all competently managed defined contribution plans.  As the Roche TDFs completed their first calendar year in 2013, three-year rolling data was available to the Administrative

Committee as early as the end of 2015. Five-year returns became available by the end of 2017, as mentioned above. It, therefore, should have been obvious to Defendants by 2015 (and no later than the end of 2017), at which point they should have been closely monitoring the Roche TDFs' underperformance compared to any or all of the Off-the-Shelf TDFs on a three-year rolling basis, that the Plan's investment in the custom suite was functioning to the severe detriment of participants' long-term retirement savings.

151. The inclusion of the Roche TDFs in the Plan and the failure to remove the Roche TDFs from the Plan, based upon information then available to Defendants, was a breach of fiduciary duty.

152. Defendants' faith in Russell to manage the Roche TDFs' glide path was woefully misguided. Russell's track record with its retail target date funds should have been apparent. The firm has no history of successful management in the target date space. Its custom solutions have disappointed other plans as well: the publicly available target date RFP response to the SFDC Plan contains a note from that plan's investment committee that the performance of the plan's custom TDFs managed by Russell "has struggled relative to off-the-shelf TDFs since inception in April 2012." Thus, it is apparent that Defendants never should have chosen Russell to advise on and effectively manage the Roche TDFs.

153. For the Roche TDFs, struggle is a severe understatement. An investment in any of the Off-the-Shelf TDFs, which have collectively garnered over four-fifths of the assets in the target date market, would have produced hundreds of millions of dollars in retirement savings that the Roche TDFs have failed to generate. With the returns of the custom suite in hand and matching data for the Off-the-Shelf TDFs readily available, Defendants could have easily calculated the shortfall. Given the prominence of target date funds in defined contribution plans, including the Plan, the magnitude of this underperformance cannot be overstated.

154.    By way of example, applying the different returns for each vintage of the Off-the-Shelf TDFs to the asset levels in the corresponding Roche TDF at the start of the five-year period beginning January 1, 2016 and ended December 31, 2020 demonstrates that participants would have been at least $100 million better off had Defendants elected to replace the custom suite with any of the identified peer group alternatives.

| Roche TDF Suite Shortfall vs Off-the-Shelf Suites for the 5 Years Ended 12/31/2020 | |
| --- | --- |
| Suite | Shortfall |
| Vanguard | $ (260,701,011.35) |
| T. Rowe Price | $ (444,206,880.39) |
| American | $ (466,796,631.78) |
| Fidelity | $ (400,721,179.72) |
| JPMorgan | $ (100,058,222.63) |
| BlackRock | $ (197,568,451.44) |

155.    Defendants' failure to consider the myriad of superior alternative target date offerings, and selection and retention of the Roche TDFs, represents a severe breach of fiduciary duty that has caused losses to the Plan in an amount well in excess of $100 million.

### 3.   Plaintiff Lacks Knowledge of Defendants' Conduct and Prudent Alternatives

156.    Plaintiff did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, the costs of the Plan's investments compared to those in similarly-sized plans, the availability of superior investment options, or the costs of the Plan's administrative and recordkeeping services compared to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments as well as Defendants' processes for

selecting and monitoring the Plan's recordkeeper and other service providers), because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Amended Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

157.   As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and loyalty to the Plan.  Plaintiff did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

## VI.   CLASS ALLEGATIONS

158.   This action is brought as a class action by Plaintiff on behalf of himself and the following proposed class (the "Class"):

> All participants and beneficiaries in the U.S. Roche 401(k) Savings Plan (the "Plan") at any time on or after October 2, 2014 to the present (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

159.   This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

160.   **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

161.   **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)   Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)      Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)      Whether and what form of relief should be afforded to Plaintiff and the Class.

162.    **Typicality**.  Plaintiff, who is a member of the Class, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

163.    **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

164.    **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

165.    **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages incurred by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

166.   **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

167.   **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

168.   Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

169.   Plaintiff's counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

170.   Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3).

## COUNT I
### (For Breach of Fiduciary Duty)

171.    Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

172.    Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA by failing to provide the Plan's participants with full, complete and accurate information, by placing the Plan's assets in the Master Trust structure that added unnecessary and excessive fees to the administration of the Plan and resulted in the Plan subsidizing the operations and expenses of other retirement plans, by choosing and maintaining Russell as the investment adviser for the Roche TDFs and by failing to monitor other fiduciaries of the Plan in the performance of their duties.

173.    To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to

1
2
his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

3
4
174.    As a direct result of Defendants' breaches of fiduciary duties, the Plan has suffered losses and damages.

5
6
7
8
9
10
175.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

11
12
<u>**COUNT II**</u>
**(Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)**

13
14
176.    Plaintiff incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

15
16
177.    Genentech is responsible for appointing, overseeing, and removing members of the Administrative Committee.

17
18
19
178.    In light of its appointment and supervisory authority, Genentech had a fiduciary responsibility to monitor the performance of the Administrative Committee and its members.

20
21
22
23
179.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

24
25
26
27
180.    To the extent that fiduciary monitoring responsibilities of Genentech was delegated, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

28
181.    Genentech breached its fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

182.   As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Genentech discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized and/or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

183.   Genentech is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count; to restore to the Plan any profits made through use of Plan assets; and is subject to other equitable or remedial relief as appropriate.

184.   Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches.  Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, the Class and the Plan, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial with respect to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Amended Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested

DATED: March 1, 2021

SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP


/s/ Kolin C. Tang
Ronald S. Kravitz
Kolin C. Tang
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com
        ktang@sfmslaw.com


James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com


James C. Shah
Michael P. Ols
Alec J. Berin
Shepherd Finkelman Miller & Shah, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com
        mols@sfmslaw.com
        aberin@sfmslaw.com


*Attorneys for Plaintiff, the Plan
and the Proposed Class*