UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW WEHNER, | Case No. 20-cv-06894-WHO |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT; RULING ON DISCOVERY DISPUTE** |
| v. | |
| GENENTECH, INC., et al., | |
| Defendants. | Re: Dkt. Nos. 51, 57 |

Plaintiff Matthew Wehner, a participating employee of the U.S. Roche 401(k) Savings Plan (the "Plan" or "Roche Plan"), brings this class action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against defendants Genentech, Inc. ("Genentech") and the U.S. Roche DC Fiduciary Committee ("Committee") for breach of their fiduciary duties and related breaches of applicable law. On February 9, 2021, I granted defendants' motion to dismiss the Complaint for failure to state a claim with leave to amend. Defendants now move to dismiss the First Amended Complaint.

Out of the fifteen market comparators Wehner provides for his excessive fee claim, the Danaher Corporation & Subsidiaries Savings Plan ("Danaher Plan") sufficiently establishes an apples-to-apples comparison to the Roche Plan. Both plans utilized Fidelity Workplace Services LLC ("Fidelity") as their recordkeeper to perform the same services to roughly the same amount of plan participants, yet the Danaher Plan deducted significantly less in fess compared to the Roche Plan. These allegations raise a plausible inference that defendants breached their fiduciary duty of prudence by charging excessive recordkeeping and administrative fees.

Imprudence, however, cannot be reasonably inferred from Wehner's conclusory allegations regarding defendants' retention of the custom-designed target date funds (the "Roche

TDFs") and selection of Russell Investment Management Company ("Russell") as the investment manager of those funds.  The duty of loyalty claim based on defendants' use of a master trust structure and continued relationship with Russell is also insufficiently pleaded.  The duty to monitor claim is derivative of the underlying breaches and only succeeds to the extent it is based on the plausibly pleaded excessive fee claim.  For these reasons, defendants' motion to dismiss is DENIED in part and GRANTED in part.

## BACKGROUND

The allegations in the original Complaint are detailed in my previous order, which I incorporate by reference here.  *See* Order Granting Motion to Dismiss with Leave to Amend ("February 2021 Order") [Dkt. No. 45].  The amended pleading retains some of those theories and adds others.  *See* First Amended Complaint ("FAC") [Dkt. No. 46].

Wehner is a former employee of Genentech and a current participant in the Roche Plan. FAC ¶ 9.  Genentech is the Plan sponsor and a fiduciary charged with administering the Plan.  *Id.* ¶ 10.  Genentech assembled the Committee and appointed Committee members to administer the Plan on Genentech's behalf, all of whom are also Plan fiduciaries.  *Id.* ¶¶ 11–12.[1]  The Plan's fiduciaries hold the Plan's assets in a master trust, the Roche U.S. Retirement Plans Master Trust ("Master Trust"), sponsored by Genentech.  *Id.* ¶ 67.  A master trust is a trust "in which assets of more than one plan sponsored by a single employer or by a group of employers under common control are held."  *See* Declaration of William G. Gaede, III in Support of Defendants' Motion to Dismiss ("Gaede Decl.") [Dkt. No. 51-2], Ex. 6 (2018 Instructions for Form 5500) at 10.[2]  As of December 31, 2019, the Plan had 34,178 participants with account balances and assets totaling just under $9.4 billion, placing it in the top 1% of all defined contribution plans in the United States. FAC ¶¶ 3–4.

Wehner asserts two causes of action in the FAC: (i) defendants' breach of the duties of

---

[1] On June 8, 2021, Wehner agreed to voluntarily dismiss Committee members David McDede, Judy Embry, Kevin Marks, Edward Harrington, Frederick Kentz, Steve Krognes, Jorge Glascock, and Ivor Solomon as individual defendants in this suit.  Joint Stipulation [Dkt. No. 60].

[2] As set forth below, defendants' request for judicial notice of plan-related documents is GRANTED.

United States District Court
Northern District of California

prudence and loyalty; and (ii) a derivative claim alleging Genentech's failure to monitor fiduciaries and co-fiduciary breaches. For his first cause of action, Wehner alleges that defendants breached their fiduciary duty of prudence to the Plan in two ways: (i) by imposing unreasonable recordkeeping and administrative fees that were directly deducted from the Plan participants' accounts and by an undisclosed indirect fee charged as a result of the Master Trust structure; and (ii) by retaining an allegedly underperforming investment fund, the Roche TDFs, and selecting Russell to manage those funds despite its poor reputation and performance.[3]

Wehner contends that virtually all "large" defined contribution plans, including the Roche Plan, hire one Retirement Plan Service ("RPS") provider to provide what he calls the "essential Recordkeeping & Administrative" ("RK&A") services for the retirement plan. FAC ¶¶ 38–39. He calculates that the Roche Plan directly deducted an average of $54 per participant for these services and provides fifteen market comparators to show that national recordkeepers, including Fidelity (the Plan's own recordkeeper), could and would have provided the exact same services to the Plan for approximately $30. *Id.* ¶¶ 41, 112–21.

As a result of the Master Trust structure, Wehner alleges that Plan participants paid additional indirect administrative fees of roughly $120 per participant in 2018 and paid similarly high amounts for such "unnecessary" Master Trust services in each year of the class period (between 2015 and 2019). *Id.* ¶ 117. Adding the $120 per participant administrative fee to the average per participant fee of $54 during the class period, he alleges that Plan participant paid almost six (6) times the amount that it should have for RK&A services. *Id.* This figure does not consider the amount of undisclosed revenue sharing and other indirect compensation that defendants paid to Fidelity. *Id.* ¶ 116. "Once the amount of Fidelity's revenue sharing is disclosed in discovery," he contends that the fees paid by Plan participants would be even higher than what he can calculate now. *Id.*

For his second imprudence theory, he alleges that defendants' deficient decision-making

---

[3] Wehner no longer challenges the Plan's retention of the Roche U.S. Small and Mid-Cap Equity Fund.

United States District Court
Northern District of California

concerning the Roche TDFs began with the selection of Russell as the advisor and investment manager of those funds. *Id.* ¶¶ 129–31. Russell is a firm with which defendants have a "long-standing relationship" through the Master Trust, which has paid millions of dollars in compensation to Russell for investment management services provided to various retirement plans within the Master Trust. *Id.* Defendants' decision to select and retain Russell to make critical decisions on the appropriate asset mix for the Roche TDFs was allegedly imprudent "given Russell's reputation and lack of standing in the target date fund market." *Id.* ¶¶ 134–36.

Wehner further alleges that the Roche TDFs' performance cannot be evaluated against defendants' custom benchmark, the Roche Target Date Fund Index, because such "custom benchmarks are imperfect as an evaluative tool as they fail to demonstrate how the investment is performing relative to peers." *Id.* ¶¶ 142–43. Rather, when evaluated against his proposed benchmarks— the S&P Target Date Indices ("S&P Indices") and six retail TDFs (Vanguard, T. Rowe Price, American Funds, Fidelity, JPMorgan, and BlackRock LifePath)—the Roche TDFs have been consistently underperforming since at least 2013. *Id.* ¶¶ 144–55.

In addition to his imprudence claims, which remain the focus of his FAC, Wehner alleges that defendants breached their duty of loyalty (i) by placing Plan assets in the Master Trust, which resulted in "subsidizing the operations and expenses of other retirement plans" within the Master Trust because Plan participants "shouldered" most of the costs and (ii) because of defendants' continued relationship with Russell. *See* FAC ¶¶ 74, 139, 172.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff

must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

## I.    REQUEST FOR JUDICIAL NOTICE

Defendants seek judicial notice of twenty-one exhibits submitted in support of their motion to dismiss. *See* Defendant's Request for Judicial Notice in Support of Their Motion to Dismiss the Amended Complaint ("RJN") [Dkt. No. 51-1]. Wehner has not opposed any of these requests.

Judicial notice of the Roche Plan's Form 5500s (including instructions) and the Master Trust Agreement, attached as Exhibits 5 through 9 to the Gaede Declaration, is GRANTED as relevant to the excessive fee allegations in the FAC. *See Rodrigues v. Bank of Am., NA*, No. 16-CV-1390, 2016 WL 3566950, at *1 n.1 (N.D. Cal. Jul. 1, 2016) (taking judicial notice of plan documents and summary plan description under the "incorporation by reference" doctrine). Judicial notice of the documents Wehner relies on for his Roche TDF allegations, attached as Exhibits 3, 4, and 10 through 21, is also GRANTED under the incorporation by reference doctrine. *See* FAC ¶ 136, 144, 146–49; Gaede Decl., Ex. 3 (Roche TDF Fact Sheet), Ex. 4 (S&P Target Date Index Series Methodology), Exs. 10–15 (fund disclosures from the six retail TDF comparators), and Exs. 16–21 (fund prospectuses, formal filings with the United States Securities and Exchange Commission ("SEC") that provide information to the public about investment offerings, from the six retail TDF comparators); *see In re Wells Fargo Mortgage-Backed Certificates Litigation*, 712 F. Supp. 2d 958, 971 n.3 (N.D. Cal. 2010) (taking judicial notice of fund prospectuses under incorporation by reference doctrine).

Defendants seek judicial notice of two industry publications by "Pensions & Investments,"

attached as Exhibits 1 and 2 to the Gaede Declaration, to challenge Wehner's allegation that "[t]he trend sponsors of large retirement plans, according to Jake Gilliam, head of multi-asset solutions at Charles Schwab, has been toward off-the-shelf target date funds and away from custom solutions like those that Russell offers, due to a desire to keep costs and complexity to a minimum." FAC ¶ 137. Judicial notice of Exhibits 1 and 2 is GRANTED "only for the fact that the information described in them was made publicly available at a particular time." *United States v. Shamir USA, Inc.*, No. 218CV09426RGKPLA, 2020 WL 6152466, at *3 (C.D. Cal. Aug. 7, 2020).

## II.       BREACH OF FIDUCIARY DUTIES

### A.       Duty of Prudence

Under ERISA, a plan fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," *see* 29 U.S.C. § 1104(a)(1), and must do so "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," *see* 29 U.S.C. § 1104(a)(1)(B). As I stated in my previous order, the omission of factual allegations referring directly to a plan fiduciary's "knowledge, methods, or investigations at the relevant times" is "not fatal to a claim alleging a breach of fiduciary duty" because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." February 2021 Order at 6 (quoting *Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718 (2nd Cir. 2012)). Thus, "[e]ven when the alleged facts do not 'directly address[] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *St. Vincent*, 712 F.3d at 718 (citation omitted). "[I]f the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a 'reasonable inference' that the defendant committed the alleged misconduct," thus "'permit[ting] the court to infer more than the mere possibility of misconduct." *Id.* (quoting *Iqbal*, 556 U.S. at 678–79).

United States District Court
Northern District of California

Wehner alleges that defendants breached their fiduciary duty of prudence to the Plan by (i) charging excessive recordkeeping and administrative fees and (ii) choosing to add and retain the Roche TDFs.  FAC ¶¶ 110–57.  I address each in turn.

### 1.    Recordkeeping and Administrative Fees

In the original Complaint, Wehner failed to provide sufficient circumstantial facts from which an imprudent process could be reasonably inferred, including "apples-to-apples" comparisons of the Plan's fees and funds.  February 2021 Order at 7–11.  His market comparators (rates from an industry publication, the 401k Averages Book, and rates Fidelity charged for recordkeeping services provided to its own plans) were inadequate because he failed to plead that the administrative fees are excessive "in relation to the *specific services* the recordkeeper provided to the *specific plan* at issue."  *Id.* at 8 (emphasis in original); *see White v. Chevron Corp.* ("*White I*"), No. 16-CV-0793-PJH, 2016 WL 4502808, at * 314 (N.D. Cal. Aug. 29, 2016) (plaintiff must allege "facts from which one could infer that the same services were available for less on the market").

In an attempt to address the deficiency, Wehner now alleges that "virtually all 'large' defined contribution plans," including the Roche Plan here, hire one service provider to provide the essential so-called "Recordkeeping & Administrative ('RK&A') services for the retirement plan."  FAC ¶¶ 38–39.  He explains that there are two types of essential RK&A services provided by all national RPS providers—"larger plans with substantial bargaining power (like the Plan)" provide "a 'bundled' fee for buffet style level of service (meaning that the services are provided in retirement industry parlance on an 'all-you-can-eat' basis)," while other plans provide "'pay-as-you-eat' services.'"  *Id.* ¶¶ 40–41, 44.  For the first type of RK&A services, he lists a number of services that are typically provided by plans, including, for example, distribution services, plan document services, and accounting and audit services.  *Id.* ¶ 40.  He then compares the Plan's fees (at an average of $54 between 2015 and 2019) to the fees of fifteen comparator plans (ranging from $25 and $35) to conclude that the Plan could have received the exact same services for a fee averaging around $30 per participant.  *Id.* ¶¶ 112–22.

Defendants take issue with the way Wehner has lumped together various services, labeled

them as "RK&A services," and used that premise to compare the Plan's fees to other plans without providing a factual basis to support the premise that all recordkeepers perform the same services. MTD 19.  They claim that the data Wehner collects from the Form 5500 filings of his fifteen comparator plans undermines his contention that all recordkeepers perform the same services. Based on the Roche Plan's 2018 Form 5500, Fidelity's fee is based in part on account maintenance services, loan processing, recordkeeping services, and securities and brokerage commissions and fees.  *See* Gaede Decl., Ex. 5 (2018 Plan 5500 Form) at 3.  But, as demonstrated in Appendix B attached to their motion to dismiss, defendants contend that the service providers of the fifteen comparator plans performed other tasks that Fidelity did not perform for the Plan (such as sub-transfer agency fees and investment advisory fees) and some did not perform tasks performed by Fidelity for the Plan (such as account maintenance and loan processing).  *See id.*, Ex. 9 (excerpts from 2018 Form 5500 filings from Wehner's fifteen comparator plans).  Thus, they argue, the Form 5500 reports for the comparator plans affirmatively demonstrate that the services performed by providers vary significantly from the Roche Plan and from each other.

I agree that Wehner's general "RK&A services" allegations are insufficient.  They do not, as I instructed in my previous order, focus on the "*specific* services the recordkeeper provided to the *specific plan* at issue."  February 2021 Order at 8.  Instead of describing the services provided by Fidelity to the Roche Plan, Wehner merely provides the common types of RK&A services that service providers typically perform for retirement plans.

That said, Appendix B to defendant's motion to dismiss provides a comparison of the kind of services Fidelity provides to the Roche Plan and the kinds of services other providers perform for the fifteen comparator plans.  Using Appendix B, Wehner narrows down his fifteen comparator plans to two—the Fortive Retirement Savings Plan ("Fortive Plan") and the Danaher Corporation and Subsidiaries Savings Plan ("Danaher Plan")—that provide the same "basket of services," utilize the same service provider as the Roche Plan (Fidelity), and yet pay significantly less fees than the  Roche Plan's participants.  Plaintiff's Opposition to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Oppo.") [Dkt. No. 52] 16.  The FAC provides the following calculations "based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not

available":

| Plan | Participants | Assets | RPS Fee | Fee per participant | Recordkeeper |
|------|--------------|--------|---------|---------------------|--------------|
| Fortive Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity |
| Danaher Plan | 35,757 | $4,565,702,706 | $988,267 | $28 | Fidelity |
| Roche Plan | 33,526 | $7,761,344,543 | $1,745,500 | $52 | Fidelity |

*see* FAC ¶ 115.[4]

In their reply brief, defendants do not dispute that the Fortive and Danaher Plans have similar service disclosures on their Form 5500s as the Roche Plan does in its Form 5500 (as depicted in Appendix B), but they argue that the two plans still fail to serve as adequate comparators for multiple other reasons. Defendants' Reply in Further Support of Their Motion to Dismiss ("Reply") [Dkt. No. 56] 9–10.[5] First, they claim that Wehner fails to take into account that the Fortive and Danaher Plans have varying asset and participant sizes. I agree that the Fortive Plan's asset and participant sizes are not comparable to the Roche Plan—the Fortive Plan's $35 per participant fee is based on only 13,502 participants and approximately $1.29 million, which is much lower than the Roche Plan's 33,526 participants and approximately $7.76 million in assets. The Danaher Plan, however, provides a significantly closer comparison—the Danaher Plan has 35,757 participants compared to the Roche Plan's 33,526 participants. While the Danaher Plan's asset size of approximately $4.56 million is relatively smaller than the Roche Plan's asset size of close to $7.76 million, Wehner adequately alleges that the Danaher Plan was still able to receive the same services from Fidelity at $28 per participant, compared to the Roche Plan's $54 per participant fee. *See* FAC ¶ 49 (alleging that a plan's bigger size leads to an "economies of scale" advantage).

---

[4] The chart embedded in paragraph 115 of the FAC states that the Roche Plan's fee was $52. Elsewhere in the FAC, Wehner alleges that the fee was $54 based on an average of the fees charged during the class period, between 2015 and 2019. FAC ¶ 112.

[5] Defendants also argue that Wehner has not offered any plausible objective indicia of imprudence because, as reflected in the FAC, the Roche Plan's participants increased between 2015 and 2019 and the recordkeeper and other administrative fees decreased. Reply 8–9; *see* FAC ¶ 112. The focus of Wehner's excessive fee claim is that the Roche Plan's fees were at all times excessive compared to *other* plans, even if Plan's fees were generally decreasing over time compared to the fees it charged in previous years.

9

1    Defendants next challenge the way Wehner calculated $54 as the fee that the Roche Plan

2    participants pay in recordkeeping and administrative fees.  Reply 9.  They point out that the Roche

3    Plan's Form 5500 reveals that the fee amount was $1,533,555 in 2018, not $1,745,500 as Wehner

4    contends in paragraph 115 of the FAC, bringing the per participant fee calculation down to

5    approximately $46.  *See* Gaede Decl., Ex. 5 (Plan 2018 Form 5500) at 3.  They argue that the

6    amount should be further reduced because the 2018 Form 5500 reports that "[$319,000] of the

7    forfeited nonvested accounts were used to pay administrative expenses," bringing the per

8    participant fee calculation down to approximately $36.  *Id.* at note 1.

9    Wehner clarifies that the FAC's use of the $1,745,500 figure was an average of the Plan's

10   fee within the class period, between 2015 and 2019, which was compared to the comparator plan's

11   recently-reported (mostly in 2018) fees.  Oppo. 16.  But even using the Plan's 2018 Form 5500's

12   figure of $1,533,55, a per-participant fee of $46 is still higher than Wehner's plausibly alleged

13   market comparator—the Danaher Plan's $28 fee—and higher than the $30 reasonable fee that he

14   advocates for in his FAC.  Assuming that this is the correct stage to litigate whether the Roche

15   Plan's fee calculation should be further reduced by the forfeited non-vested accounts to bring the

16   fee calculation down to $36, a $36 fee is also meaningfully higher than the Danaher Plan's $28 fee

17   and the alleged $30 reasonable fee.  That the $36 fee calculation is only one dollar higher than the

18   $35 figure Wehner previously claimed (in the original Complaint) that the Roche Plan participants

19   should have been paying is of no moment.  Defendants are challenging the allegations in the FAC,

20   and in the FAC, Wehner plausibly alleges that $30 is a reasonable fee that the Roche Plan could

21   have and should have charged for the services rendered.

22   Taken together, Wehner sufficiently alleges what would constitute a reasonable fee ($30

23   per participant) and supports that contention with circumstantial factual allegations that suggest

24   that the fee charged by Fidelity for the Plan ($54, $46, or $36 per participant) is excessive in

25   relation to the services it provided given that Fidelity was able to provide the same kinds of

26   services at $28 per participant for the Danaher Plan, a plan with a similar participant population

27   and relatively smaller asset size.  He has pleaded enough circumstantial evidence for me to draw

28   the reasonable inference that defendants did not act prudently to ensure that the Roche Plan's fees

United States District Court
Northern District of California

10

United States District Court
Northern District of California

were reasonable.  *See Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 467 (N.D. Cal. 2017) (excessive fee claim sufficiently pleaded where plaintiffs alleged recordkeeping expenses were higher than fees for similarly-sized plans); *Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017) (excessive fee claim sufficiently pleaded where plaintiffs alleged that "'[e]xperts in the recordkeeping industry' determined that the 'market rate' for administrative fees for plans like those at issue in this case was $35 per participant, and that the Plans' recordkeeping fees far exceeded that amount").

Defendant's only remaining argument does not undermine this conclusion.  Even if Fidelity provided the same *kinds* of services to the Danaher and Roche Plans, defendants fault Wehner for not pleading whether both plans necessarily provided the same *level* of services.  Reply 10.  They rely on *Kong v. Trader Joe's Co.* ("*Kong I*"), No. CV2005790PAJEMX, 2020 WL 5814102, at *5 (C.D. Cal. Sept. 24, 2020), to argue that Wehner is required to plead a similar *level* of services provided in order for the Danaher Plan to qualify as an apples-to-apples comparator.

The excessive fee claim in *Kong I* was dismissed because those plaintiffs failed to allege "any facts as to what would constitute a reasonable fee, or any facts suggesting that the fee charged by Capital Research is excessive in relation to the services Capital Research provides." *Kong I*, 2020 WL 5814102, at *6.  The survey they cited as evidence of the recordkeeping fees of other plans "[had] no connection to the question of whether *this* Plan could have obtained lower recordkeeping fees for the services provided by Capital Research."  *Id.*  Several of their alleged comparators had "either far more participants with account balances or far greater assets under management than this Plan."  *Id.*  Wehner's amended allegations are distinguishable.  As discussed above, he offers an adequate market comparator (the Danaher Plan) that obtained lower recordkeeping fees from the same recordkeeper (Fidelity) for the same kinds of services provided for the Roche Plan.

The *Kong I* court analogized the insufficiently alleged excessive fee claim before it to the one before the Seventh Circuit in *Divane v. Nw. Univ.*, 953 F.3d 980, 991 (7th Cir. 2020), where the plaintiff "failed to explain how a hypothetical lower-cost recordkeeper would perform at the

same *level* necessary to serve the best interests of the plans' participants." *Kong I*, 2020 WL 5814102, at *5 (emphasis added).  A review of the Seventh Circuit's opinion in *Divane* reveals that defendants place too much emphasis on the word "level" in an attempt to create a higher pleading standard than necessary for alleging an adequate market comparator.  *Kong I* did not rely on *Divane* for the proposition that plaintiffs are required to plead the same level of services (in addition to the same kinds of services) and defendants fail to cite any other case that shares their view.

Notably, another case citing *Divane* rejected a similar attempt to raise the pleading standard.  *See Stark* v. *Keycorp*, No. 1:20-CV-01254, 2021 WL 1758269, at *7 (N.D. Ohio May 4, 2021).  That court found, "Defendants' argument that Plaintiffs failed to explain how Vanguard—the third vendor identified by Plaintiffs—could have provided the necessary *level* of services" unpersuasive given that "Plaintiffs specifically allege it could have provided comparable recordkeeping and related administrative services in terms of scope and quality." *Id.* (emphasis added).  Wehner's market comparator (the Danaher Plan) used the same vendor (Fidelity) as the Roche Plan, so it is plausible that Fidelity could have provided the Roche Plan comparable services in terms of scope and quality as it did for the Danaher Plan.

Wehner's excessive fee claim based on the Roche Plan's unreasonably high recordkeeping and administrative fees is plausibly pleaded.  Defendants' motion to dismiss the excessive fee claim is DENIED.[6]

---

[6] Wehner's excessive fee claim is primarily based on the Roche Plan's alleged direct fees taken as direct payments from the Plan.  He also alleges that Fidelity received indirect compensation of roughly $120 per participant and "through the revenue sharing paid by the Master Trust" that further make the Roche Plan's fees excessive.  FAC ¶ 111–16.  These allegations (further discussed below in the context of the duty of loyalty) are too conclusory on their own to form a basis for an excessive fee claim.  Regardless, Wehner maintains his excessive fee claim based on the plausibly pleaded direct fee allegations discussed above.

In a footnote in his opposition, Wehner separately contends that his allegations about defendants' failure to provide Plan participants with full and accurate information (including discrepancies in disclosures concerning the allocation of administrative expenses and insufficient disclosure around the Master Trust) are sufficient to independently support his breach of the fiduciary duty claims.  Oppo. 18 n.9 (citing FAC ¶¶ 65, 172).  Defendants understood those allegations to be part of Wehner's revenue sharing contention, but to the extent that it is a separate claim, they argue that Wehner has not identified any basis for the claim.  Reply 12 n.6.  Defendants are right.  The FAC only passingly mentions the alleged lack of information disclosures.  The conclusory allegations in

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.     The Roche TDFs

In addition to his excessive fee claim, Wehner challenges defendants' selection and retention of the Roche custom TDFs in the Plan.  "A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches."  FAC ¶ 130.  "Target date managers make changes to the allocations to stocks, bonds, alternative investments, and cash over time.  These allocation shifts are referred to as a fund's glide path."  *Id.*

In his original Complaint, Wehner provided two retail TDFs (the Vanguard and Fidelity TDFs) as market comparators to illustrate the Roche custom TDFs' poor performance and argued that all three products (Roche TDFs and the Vanguard and Fidelity TDFs) are TDFs, so they must be comparable.  I found those allegations insufficient to make an "apples-to-apples" comparison because "simply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of the [challenged] Funds."  February 2021 Order at 14 (quoting *Anderson v. Intel Corp.*, No. 19-CV-04618-LHK, 2021 WL 229235, at *8 (N.D. Cal. Jan. 21, 2021)).  In the FAC, Wehner continues to challenge the Roche custom TDFs based on poor performance and adds allegations about the "red flags" exhibited by Russell, the investment manager hired in 2012 to design and implement the Roche custom TDFs glide path, to further support his claim.  *See* FAC ¶¶ 129–55.

Wehner argues that defendants' decision to keep Russell as advisor on the appropriate asset mix for the Roche TDFs was dubious given Russell's reputation and lack of standing in the TDF market.  *Id.* ¶ 134.  In particular, he contends that as of September 2015, Russell had just four custom TDF clients, one of which terminated its relationship with Russell in early 2016, meaning that "just two other plans entrusted the design of their glide path to Russell."  *Id.* ¶ 136.  In 2017, Russell liquidated its own retail TDF, the LifePoints Target Date Series (the "LifePoints Series").  *Id.* ¶ 134.

---

paragraphs 65 and 172 of the FAC are unlike the sufficient "duty to disclose" allegations in *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1074 (N.D. Cal. 2017), where plaintiffs provided "detailed factual allegations [to] plausibly suggest that the fiduciaries failed to disclose 'complete and accurate' information regarding certain investment options and conflicts, thus breaching their duty of loyalty to Plan participants."

These allegations do not plausibly serve as indicia of imprudence.  The limited number of custom TDF customers does not reasonably imply that Russell had a poor reputation in managing TDFs that should have prompted defendants to hire another advisor.  Defendants suggest that it is just as likely that the number of customers is simply a reflection of the relative popularity of custom TDFs over the past few years.  *See* Gaede Decl., Exs 1–2.  Nor does Wehner make any allegations to support an inference that what Russell did with its own retail TDF, the LifePoint Series, has any bearing on how it designed and implemented the Roche custom TDFs, including no allegations that compare the styles or strategies of the two funds.  *See* FAC ¶ 134 (conclusorily alleging that the Roche TDFs "mirror the poor performance of the LifePoints Series and appear to reflect a similarly poor approach to asset allocation").  Such allegations are "insufficient on [their] own to support a claim for breach of the duty of prudence." *Intel*, 2021 WL 229235, at *10–11 ("[A]lthough Plaintiffs [] plausibly alleged that there was some evidence available in 2011 that hedge funds and private equity funds carried risks and that a prudent fiduciary could have found that evidence," "that small body of evidence is insufficient on its own to support a claim for breach of the duty of prudence by the Investment Committee.").

Wehner's amended market comparators also fail to support a claim of imprudence.  He contends that performance cannot be evaluated against defendants' custom benchmark, the Roche Target Date Fund Index, because such "custom benchmarks are imperfect as an evaluative tool as they fail to demonstrate how the investment is performing relative to peers."  FAC ¶¶ 142–43.  But he fails to explain why his identified comparators—the S&P Indices and six retail TDFs—serve as "meaningful benchmarks" and only doubles down on the conclusory allegations I rejected before. *Id.* ¶¶ 144–55; February 2021 Order at 14 (citing *Intel*, 2021 WL 229235, at *8).  General assertions that the Roche TDFs, the retail TDFs, and the S&P Indices "all share the same overall purpose and strategy" and that "there is no difference between the aims of the Roche TDFs and the retail TDFs" are not enough to support an apples-to-apples comparison without factual allegations that compare the products' styles and strategies to support a finding of "meaningful benchmark." *See* Oppo. 21–22 (citing FAC ¶¶ 132–33, 146–50).  He cannot "dodge the requirement for a meaningful benchmark by merely finding a less expensive alternative fund or two with some

14

similarity."  February 2021 Order at 14 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018)); *see also Davis v. Wash. Univ.*, 960 F.3d 478, 485 (8th Cir. 2020) (affirming dismissal of claims premised on funds that broadly shared similar investing strategies, but which were "not close enough").

Wehner complains that defendants have created an insurmountable hurdle for a plaintiff to plead an ERISA imprudence claim based on performance if it is never appropriate to compare a custom product to a retail product.  Oppo. 22.  That is not the case here.  The issue is not that retail TDFs can never be compared with custom TDFs.  It's that Wehner has failed to allege sufficient facts to support such a comparison at the pleadings stage.[7]  *See, e.g.*, *Intel*, 2021 WL 229235, at *8 ("Plaintiffs' complaint contains no other factual allegations to support a finding that the funds that Plaintiffs identify therein provide a 'meaningful benchmark' against which to evaluate the performance of the Intel Funds."); *White I*, 2016 WL 4502808, at *12 (dismissing breach of prudence allegations premised on "apples-to-oranges" comparisons of "distinct investment vehicles"); *Davis v. Salesforce.com, Inc.*, No. 20-CV-01753-MMC, 2020 WL 5893405, at *4 (N.D. Cal. Oct. 5, 2020) (rejecting plaintiff's attempt to compare actively-managed and passively-managed funds that contain "the same investment style" and "materially similar characteristics" without alleging facts to support same); *Davis v. Salesforce.com, Inc.*, No. 20-CV-01753-MMC, 2021 WL 1428259, at *5 (N.D. Cal. Apr. 15, 2021), *appeal filed* No. 21-15867 (9th Cir. May 14, 2021) (finding same flaw in the amended pleading).

At the hearing, I asked Wehner to provide a case that would closely match the kind of comparison he would like me to draw between the Roche custom TDFs and retail TDFs comparators.  None of the cases he provided help the plausibility of his claim.  The two California district court opinions he cited are unhelpful because the parties in those cases did not raise issues

---

[7] While defendants rely on multiple documents referenced in the FAC and offer Appendix A attached to their motion to affirmatively argue the differences in glide path (the formula that defines the asset allocation of TDFs) between the Roche TDFs and the six alleged retail TDFs, I need not decide whether the TDFs are *in fact* different. *See* MTD 15–16; Gaede Decl., Exs. 3, 16–20.  The question at this stage is whether Wehner has sufficiently alleged a meaningful benchmark against which to evaluate the performance of the Roche TDFs to support his imprudence claim. As discussed above, I find that he has not.

United States District Court
Northern District of California

about performance comparisons between different kinds of funds, nor was it directly addressed by the courts.  In *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057 (N.D. Cal. 2017), the plaintiffs challenged the decision to include various investment options based on their excessive fees, including the JP Morgan target date funds.  The court denied dismissal of excessive fee claim because, in relevant part, the plaintiffs offered sufficient allegations showing the investment options "underperformed compared to their benchmark."  *Id.* at 1076–77.  Similarly, the plaintiff in the other California case "allge[d] facts regarding a fee differential as well as specific examples of funds that underperformed their peers," "concrete examples of cheaper better performing funds," and allegations that "these particular Transamerica investments were poor investment options and that Transamerica benefitted at the expense of participants by retaining one third of the Plan's assets in its proprietary funds."  *Bouvy v. Analog Devices, Inc.*, No. 19-CV-881 DMS (BLM), 2020 WL 3448385, at *9 (S.D. Cal. Jun. 24, 2020), *reconsideration denied,* No. 19-CV-881 DMS (BLM), 2020 WL 5363300 (S.D. Cal. Sept. 8, 2020).  Unlike the allegations in *Terraza* and *Bouvy*, Wehner fails to adequately plead why his selected comparators serve as adequate "benchmark[s]" or "peers" to the Roche custom TDFs.

Wehner also cited two out-of-circuit cases to argue that "the determination of an appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss stage."  *In re MedStar ERISA Litig.*, No. CV RDB-20-1984, 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021); *In re Quest Diagnostics Inc. ERISA Litig.*, No. CV 20-07936-SDW-LDW, 2021 WL 1783274, at *4 (D.N.J. May 4, 2021).  Both of those cases, however, distinguished *Davis v. Salesforce.com*, a case from this District where a comparison between passively-managed funds and actively-managed funds did not suffice to demonstrate imprudence, because the plaintiffs before them "based their claim for imprudence on numerous other grounds."  *MedStar*, 2021 WL 391701, at *6; *Quest*, 2021 WL 1783274, at *4 n.7.  Wehner's allegations do not go that far.  His barebones comparison between the Roche custom TDFs and retail TDFs is more akin to the inadequate market comparison at issue in *Davis v. Salesforce*.com.  *See* 2020 WL 5893405, at *3 ("Passively managed funds, however, ordinarily cannot serve as meaningful benchmarks for actively managed funds, because the two types of funds 'have different aims, different risks, and

1   different potential rewards that cater to different investors.'") (quoting *Davis v. Wash. Univ.*, 960

2   F.3d at 485)).

3       Wehner fails to state an imprudence claim predicated on defendants' retention of the

4   Roche TDFs and Russell as the investment manager for those funds.  Defendants' motion to

5   dismiss this portion of the imprudence claim is GRANTED with prejudice.

6       **B.     Duty of Loyalty**

7       ERISA's duty of loyalty requires a fiduciary to act "solely in the interest" of the Plan's

8   participants and for the "exclusive purpose" of providing benefits and defraying reasonable plan

9   administration expenses.  ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).  To state a claim for

10  breach of the duty of loyalty, the complaint must allege facts from which it plausibly can be

11  inferred that the Plan's fiduciaries subjectively intended to benefit themselves or a third party at

12  the expense of the Plan's participants.

13      I previously dismissed Wehner's duty of loyalty claim because he failed to differentiate

14  between the alleged breaches of prudence and loyalty.  February 2021 Order at 17; *see Kong v.

15  Trader Joe's Co.* ("*Kong II*"), No. CV2005790PAJEMX, 2020 WL 7062395, at *7 (C.D. Cal.

16  Nov. 30, 2020) (plaintiffs must "differentiate between breach of the duty of prudence and breach

17  of the duty of loyalty").  Although the duty of prudence remains the primary focus of the FAC,

18  Wehner adds allegations that defendants breached the duty of loyalty (i) by placing Plan assets in

19  the Master Trust, which resulted in "subsidizing the operations and expenses of other retirement

20  plans" and (ii) because of their continued relationship with Russell.  *See* FAC ¶¶ 74, 139, 172.

21  Neither theory is plausibly pleaded.

22      Wehner alleges upon information and belief that there was a discrepancy regarding the

23  allocation of administrative expenses that "is attributable to the questionable and imprudent

24  decision by the Plan's fiduciaries to use a Master Trust to hold the assets of the Plan."  FAC ¶ 65.

25  He contends that the Master Trust disclosed administrative expenses of $5,865,762 in 2018.  *Id.* ¶

26  71.[8]  Because the Plan's assets comprised of 68.59% of the assets in the Master Trust, he estimates

27

28  [8] As set forth in Appendix C attached to their motion, defendant contend that Wehner has
    calculated this figure by adding together all the "Professional Fees" ($827,595), "Contract

that the Plan's portion of those fees was $4,023,326 (*i.e.*, 68.59% of $5,865,762). *Id.* Based on the roughly 33,000 Plan participants, he calculates that each Plan participant paid "at least $119.41" in "unnecessary" fees. *Id.* ¶¶ 68, 71. He alleges that "it appears that none of the Plan's significant investment options were actually managed by Fidelity, but, nevertheless, the Plan shouldered almost 70% of this expense, thereby seemingly subsidizing investment management expenses for other Roche retirement plans" that were part of the Master Trust. *Id.* ¶ 74. From this, he concludes that "[d]efendants' use of the Master Trust structure and their permitting the Plan to indirectly subsidize the expenses of other Roche retirement plans amounted to a breach of the duty of loyalty." *Id.*

These allegations assume that all fees through the Master Trust are paid based on percentage of assets under management, and that therefore the Plan necessarily subsidizes approximately 70% of all expenses incurred through the Master Trust. Defendants argue that the Master Trust Agreement and the Plan's Form 5500 (judicially noticeable documents) demonstrate that costs are calculated on an investment basis, not a total asset basis as Wehner alleges. The Plan's Form 5500 states that "[t]he Plan either owns or shares ownership of individual pools of assets with other plans in the Master Trust . . . [and that] [i]nvestment income (loss) and administrative expenses relating to the Master Trust are allocated to the individual plans based on the Plan's *investments held* within the Master Trust," and further discloses that the Plan does *not* invest in over $3 billion of the Master Trust investments. *See* Gaede Decl., Ex. 5 (Plan 2018 Form 55) at Note 3, pp. 12-13 (emphasis added). The terms of the Master Trust require that "[w]henever the assets of more than one Plan are commingled in the Trust Fund or in any Investment Fund, the undivided interest therein of that Plan shall be debited or credited (as the case may be) (i) *for the entire amount of every contribution* received on behalf of the Plan, every benefit payment, or other expense attributable solely to that Plan, and every other transaction relating only to that Plan[.]" *Id.*, Ex. 7 (Master Trust Agreement) at section 1.4 (emphasis added).

---

Administrator Fees" ($1,029,864) and "Other" expenses ("$4,008,303) disclosed in the Master Trust's 2018 Form 5500. MTD 22; *see* Gaede Decl., Ex. 8 (Master Trust 2018 Form 5500) at Schedule H p.3)

United States District Court
Northern District of California

Wehner does not dispute that "the losses and administrative expenses from the Master Trust are passed on to the individual plans based on the proportion of Master Trust investments the Plan holds," *i.e.*, that calculation is done on an investment basis and not on a total asset basis Oppo. 17–18.  He conclusorily argues that "[t]his is what the FAC calculates" without explaining how that is so.  *Id.* at 18.  The paragraph of the FAC he cites to, however, alleges that the Master Trust administrative expenses are calculated "in proportion to the Plan's *assets* held in the trust," not based on the proportion of Master Trust investments.  FAC ¶ 71 (emphasis added).  Similarly, he contends that "it *appears* that none of the Plan's significant investment options were actually managed by Fidelity" but offers no explanation of the basis for such an allegation.  *Id.* ¶ 74 (emphasis added).  Allegations that defendants were not acting in the best interest of the Plan participants by "subsidizing" costs for other plans in the Master Trust structure are "entirely speculative, and unsupported by any facts, other than 'facts' alleged on information and belief or based on pure conjecture."  *White v. Chevron Corp.* ("*White II*"), No. 16-CV-0793-PJH, 2017 WL 2352137, at \*8 (N.D. Cal. May 31, 2017), *aff'd,* 752 F. App'x 453 (9th Cir. 2018).

The duty of loyalty allegations with respect to Russell fare no better.  Wehner alleges that "it appears that Defendants acted based upon their other business relationships with Russell" and that "based upon the cross-subsidization issues identified in the Master Trust vis-à-vis Fidelity, it is plausible that the Plan has been indirectly subsidizing services by Russell to other non-Plan components of the Master Trust."  FAC ¶ 139.  No further explanation is given in the FAC.  In his opposition brief, he simply reiterates his allegations regarding Russell's poor reputation and performance (that are insufficient to maintain an imprudence claim as discussed above) and concludes that defendants' decision to retain Russell "can be plausibly traced to the motivation to: (1) keep Russell satisfied at the expense of the participants' interests; (2) save themselves costs at the expense of Plan participants; and/or (3) indirectly subsidize services by Russell to non-Plan components of the Master Trust."  Oppo. 24 (citing FAC ¶¶ 139, 172).  These allegations support at most the *potential* for a conflict of interest" and the "potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty."  *Intel*, 2021 WL 229235, at \*12 (citing *Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018)).

1      Without factual allegations plausibly suggesting that the Plan fiduciaries engaged in self-

2   dealing or failed to act solely in the interest of the Plan's participants, Wehner's duty of loyalty

3   claim fails.  Defendants' motion to dismiss the claim is GRANTED with prejudice.

## III.    FAILURE TO MONITOR AND CO-FIDUCIARY BREACH

5      For his second cause of action, Wehner alleges that "[t]o the extent that fiduciary

6   monitoring responsibilities of Genentech was delegated, its monitoring duty included an

7   obligation to ensure that any delegated tasks were being performed prudently and loyally," and

8   that Genentech breached that monitoring duty.  FAC ¶¶ 180–81.  This claim is derivative of the

9   first claim for relief.  Because Wehner has plausibly pleaded an underlying breach of the duty of

10  prudence based on excessive recordkeeping and administrative fees, his derivative monitoring

11  claim survives as well.  Defendants' motion to dismiss that portion of the monitoring claim is

12  DENIED.  *See Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 784 (N.D. Cal.

13  2019) (denying dismissal of the monitoring and co-fiduciary derivative claims "[b]ecause the

14  Court finds that Plaintiffs have adequately alleged the underlying breaches"); *Bouvy*, 2020 WL

15  3448385, at *14 ("Because Plaintiff plausibly alleges claims for breach of duty of prudence under

16  Counts I and II and Count III related to administrative fee disclosures, he alleges plausible [duty to

17  monitor] claims.").  To the extent his derivative monitoring claim is based on the rest of the

18  insufficient allegations discussed above, the motion is GRANTED with prejudice.[9]

## IV.    DISCOVERY DISPUTE

20     After my February 2021 ruling on the original Complaint, Wehner served a demand on

21  defendants under ERISA § 104(b)(4) and Requests for Production of Documents ("Request")

22  under Federal Rule of Civil Procedure 34 seeking "All Documents identified by Defendants in

23  their Initial Disclosures dated February 10, 2021."  The parties disagree about defendants'

24  obligations to respond and have submitted a joint discovery dispute letter.  *See* Joint Discovery

25  _____

26  [9] The original Complaint included a third cause of action alternatively pleading that if defendants
    are not themselves considered ERISA fiduciaries, then defendants are liable as non-fiduciaries for
27  knowingly participating in fiduciary breaches.  February 2021 Order at 18.  At the hearing,
    Wehner clarified that he has dropped his non-fiduciary liability theory in the FAC and that he only
28  brings an alternative theory of liability to the extent defendants failed to monitor their co-
    fiduciaries.

United States District Court
Northern District of California

1    Dispute Letter ("Discovery Dispute") [Dkt. No. 57].

2          Wehner argues that defendants should be required to respond to the Requests because no

3    discovery stay has been imposed in this case.  Despite assurances by defendants at the previous

4    motion to dismiss hearing ("January Hearing") that they would "disclose appropriately," he claims

5    that defendants have not produced any documents with their initial disclosures and that their

6    response to his section 104(b)(4) demand consisted of a limited set of documents containing no

7    committee meeting minutes, agendas, or other materials reflecting the committee's actual

8    monitoring or administration of the plan.  Reiterating a point he made at the January Hearing, he

9    argues that "[p]roducing the minutes for their committee meetings is not a burdensome process."

10    Transcript of January Hearing [Dkt. No. 43] 13:24–25.  He asks that I order defendants to respond

11    to the Request and produce committee meeting minutes and other readily accessible decisional

12    materials.

13          Defendants contend that their initial disclosures and response to Wehner's section

14    104(b)(4) demand are adequate at the pleadings stage.  With respect to their initial disclosures,

15    they argue that Rule 26(a) only requires that they identify categories of potentially relevant

16    documents; it does not require them to produce those documents.  *See* Fed. R. Civ. P.

17    26(a)(1)(A)(ii) (initial disclosures include "a description by category and location of, all

18    documents . . . that the disclosing party may use to support its claims or defenses."); *Husain v.*

19    *Khan*, No. C06-07081 JF HRL, 2007 WL 4208285, at *1 (N.D. Cal. Nov. 27, 2007) (initial

20    disclosures "do[] not require initial disclosure document production."); *Jake's Fireworks, Inc. v.*

21    *Sky Thunder, LLC*, No. 16-CV-2475-JAR-GLR, 2017 WL 4037705, at *2 (D. Kan. Sept. 13,

22    2017) ("Plaintiff is not required to produce documents to fulfill its initial disclosure obligations

23    under Fed. R. Civ. P. 26(a).").

24          As I noted at the January Hearing, "the information really is held on one side" in these

25    sorts of cases and "it can be hard to point out the other things that are 'something more'."

26    Transcript of January Hearing at 11:9–15.  But Wehner has not convinced me that he is entitled to

27    the wide breadth of documents he demands at this stage.  He contends that "many ERISA

28    defendants voluntarily agree to produce the very documents sought here while a motion to dismiss

United States District Court
Northern District of California

1    is pending as part of a phased discovery approach," but offers no authority to support such a

2    contention other than "the experience of [his] counsel." Discovery Dispute at 3.

3            In another ERISA suit, plaintiffs similarly argued that "they should be permitted to

4    conduct discovery in order to acquire [sufficient] facts" to support their claims. *White I*, 2016 WL

5    4502808, at *19. The court acknowledged that "an ERISA plaintiff may lack direct evidence of

6    the fiduciaries' process." *Id.* Nevertheless, it held that a "plaintiff must at a minimum plead facts

7    that give rise to a 'reasonable inference' that the defendant committed the alleged violation." *Id.*

8    (citation omitted). Plaintiffs failed to do that in *White*, and Wehner fails to do that here with

9    respect to all of the claims addressed above, except for the excessive fee claim. *See id.* at *10

10   ("Rule 8 does not unlock the doors of discovery for a plaintiff armed with nothing more than

11   conclusions. Only a complaint that pleads sufficient facts to state a plausible claim for relief

12   will survive a motion to dismiss.") (internal quotation marks and citation omitted); *see also White*

13   *II*, 2017 WL 2352137, at *17–*18 (rejecting plaintiff's claim that "exceedingly opaque" fee

14   structure is "inside information" solely in control of defendants and therefore his claim should

15   survive motion to dismiss).

16           Wehner has not established that he is entitled to the documents under the ERISA statute

17   either. Under section 104(b)(4), a plan participant is entitled to "the latest updated summary, plan

18   description, and the latest annual report, any terminal report, the bargaining agreement, trust

19   agreement, contract, or other instruments under which the plan is established or operated." 29

20   U.S.C. § 1024(b)(4). The Ninth Circuit strictly construes these requirements. *See Hughes*

21   *Salaried Retirees Action Comm. v. Administrator of the Hughes Non-Bargaining Retirement Plan*,

22   72 F.3d 686, 691 (9th Cir. 1995) (en banc), *cert. denied,* 116 S. Ct. 1676 (1996) (interpreting the

23   "other instruments" language in the statute to be "documents that are similar in nature to the

24   documents specifically listed in § 104(b)(4)"); *Shaver v. Operating Eng'rs Local 428 Pension*

25   *Trust Fund*, 332 F.3d 1198, 1202 (9th Cir. 2003) (finding that the term, "other instruments" is

26   limited to the class of objects that specifically precedes it and does not include broader materials

27   such as plan expenses); *Johnston v. Masterson Communication*, No. C-06-04644, 2007 WL

28   9812997, at *2 (N.D. Cal. Feb. 27, 2007) (finding that the Ninth Circuit only requires "specified

United States District Court
Northern District of California

22

United States District Court
Northern District of California

1  disclosure, not general disclosure" for section 104(b)(4) demands).

2      Wehner fails to cite any case law that undermines defendants' objection to his section

3  104(b)(4) demand as overly broad and outside the scope of the statute.  For example, he requested

4  "Minutes of Trustee Minutes" and "Minutes of any meetings of the Committee, or similar

5  governing entities of the Plan (and all committees and subcommittees thereof)."  *See* Oppo., Ex.

6  B. at 2–3.  Other courts have found similar requests for "meeting minutes" to be overly broad and

7  not within the scope of a section 104(b)(4) demand.  *See, e.g.*, *Brown v. Am. Life Holdings, Inc.*,

8  190 F.3d 856, 861–62 (8th Cir. 1999) (agreeing with the Ninth Circuit's construction of "other

9  instruments" in *Hughes* and finding meeting minutes were not within the scope of a section

10  104(b)(4) demand); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 655 (4th Cir. 1996) (assuming

11  arguendo that section 104(b)(4) may encompass certain trustees' meeting minutes but finding

12  defendant did not violate section 104(b)(4) by failing to respond because the demand for "minutes

13  of any meetings regarding the [employee stock ownership plan] during the last three years" was

14  overly broad).

15      Discovery with respect to the plausibly alleged excessive fee claim discussed above may

16  proceed.  But Wehner's request for an order requiring defendants "to respond to the Request and

17  produce committee meeting minutes and other readily accessible basic decisional materials" with

18  respect to the remaining insufficiently pleaded claims is DENIED.

19  **CONCLUSION**

20      Defendants' motion to dismiss the excessive fee claim under Wehner's first cause of action

21  for breach of the fiduciary duty of prudence is DENIED.  Because he has sufficiently pleaded an

22  underlying breach based on excessive fees, defendants' motion to dismiss the derivative second

23  cause of action for failure to monitor, to the extent that it is based on the excessive fee claim, is

24  also DENIED.  Their motion is otherwise GRANTED with prejudice.

25      **IT IS SO ORDERED.**

26  Dated: June 14, 2021



William H. Orrick
United States District Judge